STATE of Wisconsin, Plaintiff-Respondent,†

v.

Jonathan W. NAWROCKI, Defendant-Appellant.

Court of Appeals

*No. 2006AP2502–CR. Submitted on briefs May 5, 2007.
—Decided January 31, 2008.*

2008 WI App 23

(Also reported in 746 N.W.2d 509.)

† Petition for review denied 6/10/08.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Scott D. Obernberger* of *Obernberger & Associates, LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Christopher G. Wren*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Higginbotham, P.J., Dykman and Vergeront, JJ.

¶ 1. HIGGINBOTHAM, P.J. Jonathan Nawrocki appeals a judgment of conviction for robbery with use of force as a party to a crime, contending that the circuit court should have suppressed arrest scene showup[1] identifications of him by the victim and a third-party witness under *State v. Dubose*, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582.[2]

¶ 2. The issue presented in this case is whether a showup identification is necessary, thus meeting the first test of admissibility under *Dubose*, when probable cause exists to justify an arrest of a suspect, but it does not exist on the particular offense under investigation.[3] We conclude that whenever probable cause exists to

---

[1] "A 'showup' is an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes." *State v. Dubose*, 2005 WI 126, ¶ 1 n.1, 285 Wis. 2d 143, 699 N.W.2d 582 (*citing State v. Wolverton*, 193 Wis. 2d 234, 263 n.21, 533 N.W.2d 167 (1995) (*citing Stovall v. Denno*, 388 U.S. 293, 302 (1967))).

[2] Nawrocki also contends that the evidence presented at trial was insufficient to convict him. Because Nawrocki has not sufficiently developed this argument, we do not address it. *See Clean Wisconsin, Inc. v. Public Serv. Comm'n*, 2005 WI 93, ¶ 180 n. 40, 282 Wis. 2d 250, 700 N.W.2d 768 (undeveloped arguments need not be addressed).

[3] The State suggests that this case also raises the issue of whether *Dubose* applies retroactively, and requests, in a footnote to its brief, the opportunity to file a supplemental brief addressing this issue "[i]f the court concludes that it must address the retroactivity of *Dubose* in order to decide the appeal." We conclude that this issue has been waived—twice, in fact, if such a thing were possible. As Nawrocki correctly notes, the prosecutor did not object when the circuit court declared, "you have to understand I have to impose the law as it is now

justify detention of a suspect, regardless of whether it exists on the offense under investigation, a showup identification is not necessary within the meaning of *Dubose.*

¶ 3. Because it is undisputed that officers, while lacking probable cause to arrest Nawrocki on the offense under investigation, had probable cause to arrest him on another offense, we conclude the showup was not necessary and was thus inadmissible under *Dubose.* We therefore reverse the circuit court's order denying Nawrocki's motion to suppress evidence of the showup identifications. However, we remand for the circuit court to determine whether the victim's in-court identification was based on an untainted, independent source, and for further proceedings that may be necessary consistent with this opinion.

### *Background*

¶ 4. Following a jury trial, Jonathan Nawrocki was convicted of one count of robbery with use of force as a party to a crime, contrary to WIS. STAT. §§ 943.32(1)(a) and 939.05 (2005–06).[4] The conviction stemmed from the June 28, 2005 robbery and assault of Mark Gerhardt, which occurred shortly before 2 a.m. while Gerhardt was parked outside of his mother's residence at 1515 South 72nd Street in West Allis.

---

post-*Dubose*," effectively waiving an argument against retroactive application of *Dubose.* Regardless, the State again passes on this issue on appeal by declining to develop the argument against retroactive application. To avoid waiving an argument on appeal, parties should develop *in the principal brief* all arguments that they reasonably believe may be relevant to the outcome of the case.

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

¶ 5. At trial, Gerhardt testified that he was listening to music in his van when two men approached. Gerhardt testified that one of the men opened the door and immediately struck him in the face three or four times. In court, Gerhardt identified Nawrocki as the person who opened the door and struck him in the face. Gerhardt testified that Nawrocki and the other man near the car yelled repeatedly, "Where's your wallet? Give me your wallet," then took his wallet out of his rear left pants pocket. According to Gerhardt, Nawrocki and the other man then fled, joined up with two other men who had observed the robbery from a distance, and ran south toward National Avenue. Additional testimony relevant to the basis for Gerhardt's in-court identification of Nawrocki is set forth in the discussion section.

¶ 6. Police Officer Brad Sterling testified that he was dispatched to the 7200 block of West National Avenue at approximately 2 a.m. to respond to a call from a city worker, who was operating a street sweeper. Upon arriving, Sterling found the city worker on the street with four young men. One of the young men, Joshua Kojis, told Sterling that he and his friends were looking for four other men in connection with the robbery and assault of Kojis' brother, Mark Gerhardt, a few minutes earlier. The city worker told Sterling that he had seen four men running southbound shortly before Kojis' posse arrived.

¶ 7. Sterling then drove to 1515 South 72nd Street to talk with Mark Gerhardt. Sterling testified that Gerhardt was bleeding from his nose and his eye, and was visibly upset. Sterling testified that Gerhardt told him that two men in their late teens or early twenties had assaulted and robbed him, one a stockier white male wearing a white T-shirt and the other a

taller, skinny white male in a dark blue or black T-shirt. Gerhardt said that two others, both white males and one possibly of Hispanic origin, stayed back a distance from the van. Sterling testified that Gerhardt said that, after the assault, the four ran south together down 72nd Street. Gerhardt told Sterling that he then went into the house as Kojis and Kojis' friends left the house to look for the assailants. Sterling radioed Gerhardt's description of the four men to the dispatcher and the direction in which the men were traveling.

¶ 8. Police Officer Nick Stachula was dispatched to the area to locate the suspects. Stachula testified that he spotted two white males walking within a couple of blocks of the scene of the robbery. Stachula, who was in full uniform, pulled his marked police car up behind the two men. Stachula got out of the car and said, "Stop, police!" When both men continued walking, Stachula repeated the command at a higher volume. At this, one of the men, who was wearing a white shirt and was later identified as Steven Bingenheimer, stopped, while the other, wearing a blue shirt and later identified as Nawrocki, continued walking, picking up his pace. Stachula made contact with Bingenheimer, and radioed for another officer to stop Nawrocki.

¶ 9. Within moments, Police Officer Marla Scherbarth pulled her squad car along side Stachula, who pointed out Nawrocki, still visible approximately one block down the street. Scherbarth testified that she drove toward Nawrocki, and, pulling next to him, saw him look over at her, put his head down and continue walking. Scherbarth pulled ahead of Nawrocki and parked her squad car. Scherbarth described what happened when she got out of her car and attempted to stop Nawrocki:

A: ... Um, as soon as I got out, I'm like, "Police, stop," and he looked over at me and said, "What the fuck are you stopping me for? I didn't do anything," and at that point I could tell—we made eye contact, and his body language was telling me like either he's going to run or be uncooperative which was very—his gestures were like he was thinking about it.

Q: And what was it that made you think that, that he was going to run or be uncooperative?

A: Because he looked at me, and we made eye contact, and the way he presented himself, his body, a slight crouch down, looking a different direction, and I'm thinking, "He's going to run."

¶ 10. Scherbarth testified that she responded to Nawrocki's body language by telling him, "Stop. Get your hands out where I can see them." She testified that he did not comply with this request, that Nawrocki was angry, and his tone of voice was aggressive. Stachula, who remained with Bingenheimer, testified that he overheard Nawrocki yelling at Scherbarth. Scherbarth responded to Nawrocki's aggressive tone by grabbing his arm and placing him in handcuffs. She testified that "as soon as I grabbed a hold, he tensed up and I quick put on the cuffs."

A: Um, as soon as I went to put my hands on him—on his lower wrist area, his whole upper body tensed up. I could feel it in his arm, and it was get the cuffs on fast or there is a possibility that I was going to end up fighting with this individual.

. . . .

A: [W]hen I got out and he wouldn't show his hands, you could tell his whole body was very tense. He was mad that I was stopping him, I was making contact

235

with him. I don't remember exactly what he said except for the initial statement because it was kind of shocking that he would just come out and say, "I didn't do anything." Um, but like I said, he was very angry with the fact that I was stopping him.

¶ 11. Scherbarth testified that, after being handcuffed, Nawrocki initially refused to sit down on the curb when ordered to do so, and continued to swear and demand to know why he was being stopped. Scherbarth testified that she recalled that Nawrocki was wearing a light-colored jersey with blood stains. Scherbarth later identified the blood-stained jersey at trial. Officers ran Nawrocki's name and determined that he was on probation.

¶ 12. After receiving a radio message that officers had stopped two men in the vicinity of 73rd and Beecher Streets, Sterling drove Gerhardt to the area to conduct an on-scene identification. At the suppression hearing, Sterling testified he told Gerhardt on the way to the scene, "When we turn the corner here, you are going to be looking at some parties we have stopped; I want you to tell me is any of these parties we have stopped . . . involved in the incident with you." Upon arriving at 73rd and Beecher Streets, Sterling trained his squad car's spotlight on one of the men that the officers had stopped. Sterling pulled the squad car within ten feet of the suspect, who was standing on the sidewalk in handcuffs within five feet of Officer Scherbarth, who was in uniform. A total of four squad cars were parked within one block of the scene. Sterling then asked Gerhardt, "Is this one of the parties that was involved in the incident with you?" Sterling testified that Gerhardt identified the man "one hundred percent" as the person who "took him out of the van and took his wallet."

¶ 13. Sterling then drove Gerhardt down the street where Officer Stachula was standing. Two men, Bingenheimer and Jeffrey Lester, were pulled one at a time into the squad car's spotlight, neither in handcuffs, for Gerhardt to identify. Gerhardt was not positive that either man was involved in the incident, and Sterling testified that Gerhardt told him "the other person that assaulted him was not there."

¶ 14. Darinell Albert,[5] a sixteen-year-old friend of Joshua Kojis who was staying over at Gerhardt's mother's house that night, testified that he was playing video games or watching television with friends when he looked out of the window and saw three young men running by. Albert testified that when Gerhardt walked in shortly thereafter, bloodied and explaining that he had just been jumped, Albert and the others ran to the window and saw three people running down the street away from the van. Shortly thereafter, Albert and three other young men left the house to find the men who had jumped Gerhardt.

¶ 15. Albert and his friends were later brought to the scene to identify Nawrocki, Lester and Bingenheimer. Albert testified that he positively identified two of the men at the scene, one of them being Nawrocki. In court, Albert then identified Nawrocki as one of the men that he positively identified at the showup. Additional facts relevant to Albert's in-court identification of Nawrocki are provided in the discussion section.

¶ 16. Following the positive identifications of Nawrocki by Gerhardt and Albert, Nawrocki was arrested and taken into custody. Nawrocki was charged with one count of robbery with use of force as a party to

---

[5] This person is also referred to in the trial transcript as "Albert Darinell."

a crime. He moved to suppress evidence of the arrest scene showup identifications and all subsequent identifications of him by Gerhardt and Albert, arguing that the showup identifications failed to meet the procedural requirements of *Dubose*, and that all subsequent identifications could not be purged of the taint of the inadmissible showup. The Milwaukee County Circuit Court denied the motion after a hearing. Nawrocki was found guilty following a jury trial, and a judgment of conviction was subsequently entered against him. Nawrocki appeals.

### Standards of Review

¶ 17. We review a circuit court's order on a motion to suppress an out-of-court identification in two parts. *Dubose*, 285 Wis. 2d 143, ¶ 16. Any findings of historical or evidentiary facts made by the circuit court in deciding the suppression motion will be upheld unless they are clearly erroneous. *Id.* However, a circuit court's application of the relevant constitutional standards to these historical or evidentiary facts presents a question of law that we review de novo. *Id.* We apply the same standards of review to the admissibility of the in-court identifications of Nawrocki, upholding factual determinations unless clearly erroneous, while reviewing independently the application of constitutional principles to those facts. *See State v. Roberson*, 2006 WI 80, ¶ 25, 292 Wis. 2d 280, 717 N.W.2d 111.

### Discussion

¶ 18. Nawrocki contends that the circuit court erred in denying his motion to suppress testimony about the showup identifications because it misconstrued the standard established in *Dubose* regarding

the admissibility of showup identification evidence. Specifically, he argues that the showups were not necessary within the meaning of *Dubose* and are therefore inadmissible because probable cause existed to detain him on an offense other than the one under investigation. Nawrocki maintains that because officers had a legal basis to detain him for purposes of conducting a less suggestive identification procedure, the showup was not necessary. He also asserts that, if the showup identifications were necessary, they are still inadmissible because they were conducted in an impermissibly suggestive manner.

### Admissibility of the Showup Identifications

¶ 19. Before *Dubose*, Wisconsin courts applied the test established in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), when determining the admissibility of showup identification evidence. *See Dubose*, 285 Wis. 2d 143, ¶¶ 26–27 (*discussing State v. Wolverton*, 193 Wis. 2d 234, 533 N.W.2d 167 (1995). *Biggers* and *Braithwaite* read the Fourteenth Amendment to permit admission of evidence obtained from a suggestive identification procedure when the evidence was deemed reliable, as determined by application of a five-part test.[6] Reliability, in the words of the *Braithwaite* court,

---

[6] This test calls for courts to consider the following factors when determining the reliability of a suggestive identification: "(1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime

was seen as "the linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. 98 at 114.

¶ 20. In *Dubose*, the supreme court concluded that, with regard to the admissibility of showup identifications, the *Biggers* and *Braithwaite* reliability test was no longer sufficient to guarantee the right to due process provided under Article 1, Section 8 of the Wisconsin Constitution. The *Dubose* court reached this conclusion based on a growing body of empirical data indicating that eyewitness identification evidence "is often hopelessly unreliable," and that "eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined." *Dubose*, 285 Wis. 2d 143, ¶¶ 29–30 (citation omitted). In light of such evidence, the court declared: "It is now clear to us that the use of unnecessarily suggestive evidence resulting from a showup procedure presents serious problems in Wisconsin criminal law cases." *Id.*, ¶ 32. The court rejected the *Biggers/Braithwaite* methodology when applied to showup identifications as "unsound, since it is extremely difficult, if not impossible, for courts to distinguish between identifications that were reliable and identifications that were unreliable." *Id.*, ¶ 31.

¶ 21. The *Dubose* court then adopted the approach set forth by the United States Supreme Court in *Stovall v. Denno*, 388 U.S. 293 (1967), which focused on the necessity of the identification procedure. *Dubose*, 285 Wis. 2d 143, ¶ 2. In *Stovall*, the Supreme Court recognized that an identification procedure could be "so

and the confrontation." *Dubose*, 285 Wis. 2d 143, ¶ 24 (*citing Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)).

unnecessarily suggestive and conducive to irreparable mistaken identification" as to result in a denial of due process. *Stovall,* 388 U.S. at 302. The *Stovall* court decried the use of showup identifications: "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* Nonetheless, the court deemed admissible the showup identification evidence there because the showup was "imperative" under the unique circumstances of Stovall's case, in which the victim was hospitalized with life-threatening injuries, necessitating an immediate identification and preventing the victim from leaving the hospital to identify the suspect in a police station line-up. *Id.*

¶ 22. With *Stovall* as its guide, the *Dubose* court fashioned a two-part admissibility test for showup identification evidence. *Dubose,* 285 Wis. 2d 143, ¶¶ 33, 35. This test requires the court to determine whether (1) the showup procedure was necessary under the totality of the circumstances, and, if necessary, (2) that care was taken to minimize the suggestiveness of the procedure. *Id.* The *Dubose* court explained:

> We conclude that evidence obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary. A showup will not be necessary, however, unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array. A lineup or photo array is generally fairer than a showup, because it distributes the probability of identification among the number of persons arrayed, thus reducing the risk of a misidentification.

241

. . . .

 If and when the police determine that a showup is necessary, special care must be taken to minimize potential suggestiveness. We recommend procedures similar to those proposed by [amicus] the Wisconsin Innocence Project to help make showup identifications as non-suggestive as possible. For example, it is important that showups are not conducted in locations, or in a manner, that implicitly conveys to the witness that the suspect is guilty. Showups conducted in police stations, squad cars, or with the suspect in handcuffs that are visible to any witness, all carry with them inferences of guilt, and thus should be considered suggestive. Next, officers investigating the matter at issue should proceed with caution in instructing the witness. The investigators must realize that a witness's memory of an event can be fragile and that the amount and accuracy of the information obtained from a witness depends in part on the method of questioning. Therefore, an eyewitness should be told that the real suspect may or may not be present, and that the investigation will continue regardless of the result of the impending identification procedure. Finally, it is important that a suspect be shown to the witness only once. If a suspect is identified, the police have no reason to conduct further identification procedures. Conversely, if the suspect is not identified by the witness, he or she should not be presented to that witness in any subsequent showups. While this list is far from complete, a showup conducted in accord with these standards will do much to alleviate the inherent suggestiveness of the procedure.

*Id.* (citations and footnotes omitted). Following the two-part test announced in *Dubose*, we first consider whether the arrest scene showup of Nawrocki was necessary.

¶ 23. A showup is "necessary," in the words of *Dubose*, only when "police lack[] probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array." *Id.*, ¶ 33. Here, the parties appear to agree that, prior to the showup identification, officers: (1) lacked probable cause to arrest Nawrocki for the crime of robbery with use of force, the offense officers were investigating; but (2) had probable cause to arrest Nawrocki for other potential criminal violations.[7] The parties' dispute centers on whether the showup was necessary within the meaning of *Dubose* when there was no probable cause to arrest on the offense under investigation, but prob-

---

[7] The State does not dispute Nawrocki's assertion that probable cause existed to arrest him for other potential violations. Nawrocki argues that the officer had at least three bases on which to arrest him prior to the showup identification. First, he asserts that officers had probable cause to arrest him for obstructing an officer, contrary to WIS. STAT. § 946.41, based on Officer Stachula's testimony that he ignored his command to stop and continued to walk away, and Officer Scherbarth's testimony that he (Nawrocki) yelled obscenities at her and refused to comply with a request to put his hands where she could see them. Second, he asserts that probable cause existed to arrest him for disorderly conduct, contrary to WIS. STAT. § 947.01, based on testimony of Stachula and Scherbarth that he yelled obscenities at Scherbarth on a public street in a residential area sometime after 2 a.m. Third, he notes he was on probation at the time, and that a legal basis for detention on a probation violation existed because he was heavily intoxicated —Stachula testified that he was too intoxicated for him to interrogate two hours after the arrest—and was only nineteen years old, not of legal drinking age. While noting Nawrocki's purported bases for detention, we need not decide which, if any, of these bases was actually sufficient to justify detention because the State does not dispute that officers had a legal basis upon which to detain Nawrocki.

able cause existed to arrest on another offense. The State contends that the necessity determination turns on whether there is probable cause to arrest on the offense under investigation. Thus, the State argues that, because there was no probable cause to arrest Nawrocki for the robbery, the showup identifications were necessary. Nawrocki, on the other hand, asserts that an arrest scene showup identification is necessary only when there is no probable cause to justify an arrest for any potential criminal violation, not just for the instant offense under investigation. Thus, Nawrocki argues that, because there was probable cause to arrest him on disorderly conduct and other offenses, the arrest scene showup procedure was not necessary within the meaning of *Dubose*.

¶ 24. In support of its view, the State argues that the necessity test was not intended to establish a "mandatory-arrest" standard requiring officers to search for any offense justifying an arrest, no matter how trivial, before conducting a showup. The State asserts that this interpretation of *Dubose* is contrary to an admonition to law enforcement in *Newspapers, Inc. v. Breier*, 89 Wis. 2d 417, 279 N.W. 179 (1979), not to abuse the power to arrest "by taking persons into custody on trivial charges when charges of greater magnitude would be appropriate." *Id.* at 436. Nawrocki responds that the State's interpretation is contrary to *Dubose* because it would admit showup identifications that are not truly necessary. Nawrocki argues that a showup cannot be necessary when probable cause exists to justify an arrest for a potential criminal violation, giving officers a legal basis to detain a suspect for purposes of conducting an identification procedure that is less conducive to misidentification, such as a line-up or photo array. We agree with Nawrocki.

¶ 25. The standard fashioned by the *Dubose* court strictly limited the admissibility of showup identification evidence to cases in which the showup procedure was necessary, based on the totality of the circumstances. *Dubose*, 285 Wis. 2d 143, ¶¶ 2, 33. Thus, the general rule is that showup identification evidence is inadmissible. The *Dubose* court carved out an exception to this rule for situations in which a showup is necessary, i.e. when there is no probable cause to arrest the suspect, or when exigent circumstances require an immediate identification. *Id.*, ¶ 33.

¶ 26. We observe that the absence of probable cause makes a showup procedure necessary because officers lack a legal basis to detain the person and thus cannot acquire identification evidence by another, less suggestive procedure, such as a lineup or photo array. *Id.* Stated differently, a showup is necessary when officers lack other constitutional means to obtain a suspect's identification. However, where probable cause exists, whether it is related to the offense under investigation or some other offense, officers have the constitutional means to detain the suspect and secure an identification using a procedure that is less conducive to misidentification. We therefore conclude that a showup is unnecessary and thus inadmissible under *Dubose* when probable cause exists to justify an arrest, regardless whether it exists on the particular offense under investigation.[8]

---

[8] This conclusion negates our need to address Nawrocki's alternate argument for suppression of the showup identification evidence, that the showup was conducted in an impermissibly suggestive manner.

¶ 27. The State's narrow interpretation of the necessity test runs counter to the purposes of *Dubose*. The supreme court in *Dubose* established a rigorous test for the admissibility of showup identification evidence grounded in the due process guarantees of Article 1, Section 8 of the Wisconsin Constitution and the principles enunciated by the Supreme Court in *Stovall*. The *Dubose* court adopted this standard in light of evidence that misidentification had led to an epidemic of wrongful convictions, and that the showup procedure was particularly suggestive and thus conducive to misidentification. A rule permitting admission of inherently suggestive showup identification evidence in situations in which officers have a legal basis to detain a suspect (but lack a legal basis related to the offense under investigation) would likely result in a higher incidence of misidentification and wrongful convictions in Wisconsin, the serious ills *Dubose* sought to remedy.

¶ 28. Applying the necessity test as we have construed it here, we conclude the circuit court erroneously admitted evidence of Gerhardt's and Albert's showup identifications of Nawrocki. It is undisputed that the officers had probable cause to detain and arrest Nawrocki for other potential criminal violations and thus could have employed an identification procedure less prone to misidentification. Therefore, the showup procedure was unnecessary in this case, and the circuit court thus erred in admitting testimony about the showup identifications at trial.

### Admissibility of In-Court Identifications

¶ 29. Having concluded that the showup identifications of Nawrocki were not necessary and therefore should have been suppressed, we next must address

whether Albert's and/or Gerhardt's in-court identifications of Nawrocki were based on an independent source that was untainted by the impermissible showup identification. "[T]he exclusion of evidence of the out-of-court identifications does not deprive the prosecutor of reliable evidence of guilt. The witness would still be permitted to identify the defendant in court if that identification is based on an independent source." *Dubose*, 285 Wis. 2d 143, ¶ 38 (citation omitted).

¶ 30. The admissibility of an in-court identification following an inadmissible out-of-court identification depends on whether "the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Roberson*, 292 Wis. 2d 280, ¶ 34 (*quoting State v. Walker*, 154 Wis. 2d 158, 186, 453 N.W.2d 127 (1990) (*quoting Wong Sun v. United States*, 371 U.S. 471, 488 (1963))). To be admissible, "the in-court identification must rest on an independent recollection of the witness's initial encounter with the suspect." *Roberson*, 292 Wis. 2d 280, ¶ 34 (citations omitted). The party seeking admission of the in-court identification carries the burden of demonstrating by clear and convincing evidence that the in-court identification was not tainted by the inadmissible out-of-court identification. *See id.*, ¶ 35 (citation omitted).

¶ 31. On appeal, the parties have not presented fully-developed arguments about the admissibility of the witnesses' in-court identifications as distinct from their showup identifications. However, Nawrocki's motion before the circuit court did seek suppression of the in-court identifications of Nawrocki by Gerhardt and Albert, as well as the showup identifications. To the extent that Nawrocki's failure on appeal to argue the issue of the

admissibility of the in-court identifications suggests that the issue has been waived, we choose to address it in the interest of justice. *See City of Milwaukee v. Washington*, 2007 WI 104, ¶ 31 n.12, 304 Wis. 2d 98, 735 N.W.2d 111 (citations omitted) (noting that waiver is a rule of judicial administration that recognizes an appellate court's inherent authority to address the merits of an unpreserved issue).

¶ 32. In *Dubose*, the supreme court remanded the question of the admissibility of the in-court identifications to the circuit court to

> review any identification of Dubose made by a witness during the trial. If the court determines that any such identification was based on the unnecessarily suggestive showups and [an inadmissible] photo identification, then the conviction must be set aside and a new trial ordered, unless any in-court identification was independent or untainted. The court may uphold any in-court identification if the circuit court determines that it had an origin independent of the lineup or was sufficiently distinguishable to be purged of the primary taint. In other words, if the circuit court determines that any in-court identification of Dubose was not tainted by out-of-court identifications, then the conviction should stand. The in-court identification is admissible if the State carries the burden of showing by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the out-of-court identification.

*Dubose*, 285 Wis. 2d 143, ¶ 38 (citations omitted).

¶ 33. Here, we note that the witnesses, Gerhardt and Albert, provided substantial testimony at trial[9]

---

[9] We note that neither Albert nor Gerhardt testified at the suppression hearing.

about their initial encounters with Nawrocki, upon which any admissible in-court identification of him must be based. The analysis below sets forth this testimony in detail. Based on this testimony, we conclude that remand to the circuit court is necessary to determine whether the victim, Gerhardt, had an independent, untainted basis upon which to make an in-court identification of Nawrocki.

¶ 34. Gerhardt identified Nawrocki in court within the context of his recollection of his initial viewing of the assailant:

> [Gerhardt] A: I was listening to music, and I was going to gather [my] stuff when two guys approached the vehicle. There were four total in that vicinity of the van, but two guys came up to my door, [one] opened the door, and I got struck three or four times in the face.
>
> . . . .
>
> Q: And did you see which person opened the door?
>
> . . . .
>
> A: Jonathan Nawrocki.
>
> Q: You kind of pointed, and tell me who it is that you are pointing at today? What is he wearing?
>
> A: The man in the grey polo.
>
> Q: I would ask the record to reflect the witness has identified the defendant.
>
> THE COURT: It shall.

The prosecutor attempted to elicit additional testimony from Gerhardt about his recollection of Nawrocki:

> Q: Okay, and do you remember what the defendant looked like back on June 28th of 2005?

A: What he looked like is—I'm not sure what you mean by that.

Q: That's fine. Do you remember what kind of clothes he had on?

A: No, not really. No, I don't remember.

Q: Okay, and what did the other person look like, the second person.

A: He was bigger, more stocky.

Q: And do you remember what that person was wearing?

A: No, I may have remembered the night of, but I don't recall right now.

Gerhardt could not recall what the "taller, skinny" male, Nawrocki, was wearing, or what he had told Sterling about Nawrocki's clothing:

Q: Okay, and do you remember if you said that the taller skinny male was wearing a dark T-shirt?

A: No, I do not.

Q: You don't remember if you said that?

A: It's been so long, I really don't remember that.

¶ 35. In describing the assault and robbery, Gerhardt testified that the assailant opened the car door and immediately struck him in the face:

Q: ... So when the door opens, tell me what happens?

A: I immediately got struck in the face. Immediate, like a matter of hearing the door open, I got struck in the face.

250

Q: Did you see who struck you in the face?

A: Jonathan Nawrocki.

Q: Okay, the defendant?

A: Yes.

Q: And how did he strike you in the face?

A: I got hit with a fist three or four times in the face—in the nose area.

. . . .

Q: And when you were struck—after you were struck three or four times by the defendant, what happens next?

A: Well, I put my hands up to like block away from—try to get away from the hits, and the two that were closest to the van were yelling, "Where's your wallet? Where's your wallet? Give me your wallet."

Q: . . . . Do you remember which one was yelling it or were both of them yelling it?

A: Both of them several times.

. . . .

A: I'm left-handed. So I put my wallet in my left back pocket. So it was very easily—easy access to them. So they got my wallet and up and ran.

Q: Tell me who got your wallet.

A: I'm not sure . . . . I was protecting myself, my face.

Q: And do you know how they got your wallet?

251

A: Took it out of my back pocket . . . . [As I was] [s]itting in the driver's side of the van.

¶ 36. On cross examination, Gerhardt provided the following testimony about his initial encounter with the assailant:

Q: Okay, and you said when you turned your head, the door was already open?

A: Yup.

Q: Is that right?

A: I turned my head to a fist, essentially.

Q: To a fist, so the door was opened, you turned your head, and there were already people standing there?

A: I was immediately getting hit as I turned my head.

Q: So as you turned—

A: Because my left side was struck immediately, and the gash on my face from the pictures shows that, that I was hit on the left side of my face.

Q: Okay, and then you said as soon as you knew you were getting hit, you put your hands up to protect yourself?

A: Well, I tried. He already had three hits in before I could even react.

. . . .

Q: And you said you don't remember saying anything about clothing to the officers on that night?

A: Nope.

252

> Q: And you don't have any independent memory at this point what the clothing was like?

> A: No, I do not. Like I said, it just happened so fast.

Gerhardt testified that the entire incident lasted about thirty seconds.

¶ 37. We note that discrepancies exist between Gerhardt's direct examination testimony about the robbery, and Officer Sterling's testimony about Gerhardt's account of events given that night. On cross-examination, Gerhardt maintained that the assailant opened the van door, although Sterling later testified that Gerhardt told him that night that he, not the assailant, opened the door. Also on cross-examination, Gerhardt testified that the man later identified as Nawrocki, not the other, "stockier" male, struck him in the face, contrary to Sterling's later testimony that the "stockier" male struck him in the face. Additionally, Gerhardt testified that the men had tried to pull him from the van but did not succeed, although Sterling later testified that Gerhardt told him that the assailant actually succeeded in pulling him from the van.

¶ 38. While Gerhardt's testimony raises questions about whether his in-court identification actually rests on his recollection of his initial encounter with the assailant, we cannot decide this issue on the record before us. The critical question not fully answered in the record is whether, during the robbery, Gerhardt got a good enough look at the assailant to identify the person as Nawrocki. We therefore remand for the circuit court to hold an evidentiary hearing for the purpose of determining whether the in-court identification was based on an independent source untainted by

the impermissible showup identification. When making its determination, the circuit court should take into account the following seven factors adopted from *United States v. Wade,* 388 U.S. 218, 241 (1967):

> (1) the prior opportunity the witness had to observe the alleged criminal activity; (2) the existence of any discrepancy between any pre-lineup description and the accused's actual description; (3) any identification of another person prior to the lineup; (4) any identification by picture of the accused prior to the lineup; (5) failure to identify the accused on a prior occasion; (6) the lapse of time between the alleged crime and the lineup identification; and (7) the facts disclosed concerning the conduct of the lineup.

*State v. McMorris,* 213 Wis. 2d 156, 168, 570 N.W.2d 384 (1997) (*citing Wade,* 388 U.S. at 241).

¶ 39. As for the second eyewitness, Albert, we conclude that the record conclusively demonstrates that Albert's in-court identification of Nawrocki was not based on an independent source. Albert testified that he looked out the window of Gerhardt's mother's house and saw three young men run by. Albert testified that one of the men was wearing dark shorts that went below his knees and a black or blue T-shirt, and another had "either . . . [a] white or really dark," full-body sweat suit on.[10]

¶ 40. When asked on direct examination whether he could "remember what any of [the men he observed out of the front window] looked like," Albert responded, "Not really." Albert testified that he did recall their clothing, but could offer no other identifying informa-

---

[10] Albert testified that "it was either white because I saw the shadow, or just dark because there was no light."

tion about Nawrocki or the other men. On cross examination, Albert testified as follows about his pre-showup view of Nawrocki:

Q: [Y]ou believe [Nawrocki] was the one wearing this white sweat suit you described?

A: Yes.

Q: Can you tell me more about that? Did it look like a full-body—

A: He was wearing full—he wasn't wearing any shorts or like short sleeves. It was full-body, yes.

Q: And it was a white sweat suit?

A: Yes, as far as I can see, it was white.

. . . .

Q: So how bright was this street?

A: It wasn't that bright. That's why I thought it was dark, too, but [the white sweat suit] seemed like he was a shadow. It seemed like he was wearing white.

Q: And when you identified them, was it primarily because of their clothing?

A: Yes.

Q: When you were looking out the window at these three people running, were you able to see their faces?

A: Not description, but I happened to see their faces in rememberance [sic].

Q: Okay. So was it light enough for you to see their faces?

A: No, it wasn't.

Q: It was not?

A: No.

¶ 41. Thus, Albert: (1) saw Nawrocki in the street from the front window of the house as Nawrocki and the others were running away; (2) remembered the clothing Nawrocki was wearing at the time, identifying him at the showup "primarily" by his clothing; (3) responded, "Not really," when asked if he remembered what Nawrocki looked like; and (4) testified that it was too dark to see Nawrocki's face. Based on this testimony, and the lack of any contravening testimony, we conclude as a matter of law that Albert lacked an independent, untainted basis upon which to make an in-court identification of Nawrocki, and therefore the circuit court erred in admitting the in-court identification.

¶ 42. Finally, we must address the question of harmless error with regard to the circuit court's admission of the in-court identifications. "In determining whether a constitutional error is harmless, the inquiry is as follows: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *State v. Mayo*, 2007 WI 78, ¶ 47, 301 Wis. 2d 642, 734 N.W.2d 115 (citations omitted). The supreme court has identified several factors to consider when evaluating whether a particular error is harmless. These include:

> the frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case.

*Id.*, 301 Wis. 2d 642, ¶ 48 (*citing State v. Hale*, 2005 WI 7, ¶ 61, 277 Wis. 2d 593, 691 N.W.2d 637).

¶ 43. We concluded above that the circuit court's admission of Albert's in-court testimony was error. However, we conclude that if the circuit court determines on remand that Gerhardt had an untainted, independent recollection upon which to base his in-court identification of Nawrocki, then the circuit court's admission of Albert's in-court identification was harmless error. We so conclude because Albert's in-court identification was of little value to the State's case because Albert admitted that he could not remember what Nawrocki looked like, it was too dark to see Nawrocki's face, and his identification was based on the clothing Nawrocki wore that night.

¶ 44. Conversely, if the circuit court determines on remand that Gerhardt's in-court identification of Nawrocki did not rest upon his initial encounter with the defendant, we conclude that such an error would not be harmless. Without Gerhardt's in-court identification of Nawrocki, the State's case, which relied heavily on the showup and in-court identifications of Nawrocki, would be devoid of eyewitness identification evidence and would therefore be much weaker. Thus, we conclude that if the circuit court determines that Gerhardt's in-court identification of Nawrocki cannot be purged of the taint of the impermissible showup, then the judgment of conviction should be vacated and a new trial ordered.

*By the Court.*—Order reversed and cause remanded for further proceedings consistent with this opinion.