******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.*
# GREGORY E. MCLAURIN
## (SC 20785)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Dannehy, Clark and Westbrook, Js.*

*Syllabus*

The defendant appealed, on the granting of certification, from the judgment of the Appellate Court, which had affirmed his conviction of numerous crimes, including first degree robbery, in connection with his role in an armed robbery of a restaurant. The perpetrators of the robbery had fled the restaurant, but the police apprehended the defendant shortly thereafter and detained him in a nearby parking lot. An officer then transported B, a restaurant employee who had witnessed the robbery, to the parking lot, where she identified the defendant as one of the perpetrators. The trial court denied the defendant's motion to suppress B's identification of the defendant, reasoning that the one-on-one showup identification procedure the police used to obtain the identification was not unnecessarily suggestive and that, even if it was, B's identification was nevertheless reliable under the totality of the circumstances. On appeal to this court, the defendant claimed, inter alia, that the Appellate Court, in upholding the trial court's denial of the defendant's motion to suppress, incorrectly had concluded that the showup procedure the police used to obtain the identification was not unnecessarily suggestive. *Held*:

Even if this court assumed that the challenged showup procedure was unnecessarily suggestive, the trial court correctly concluded that B's identification of the defendant was reliable under all of the relevant circumstances, and, accordingly, the Appellate Court properly upheld the trial court's denial of the defendant's motion to suppress.

Upon review of the record and consideration of the totality of the circumstances, this court concluded that there was substantial evidence in the record to support the trial court's finding that B's identification of the defendant was reliable.

B had the opportunity to view the defendant and his accomplice while they were in the restaurant, B was attentive, insofar as she was able to provide

---

* This case originally was argued before a panel of this court consisting of former Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy. Thereafter, former Chief Justice Robinson and Justice Alexander were removed from the panel, and the case was reargued before a panel consisting of Chief Justice Mullins, Justices McDonald, D'Auria, Ecker and Dannehy, and Judges Clark and Westbrook.

a detailed description of the perpetrators and the robbery, the description that B initially provided of the defendant to the police, before she was brought to identify him, was accurate and matched his general appearance, B demonstrated great certainty when she identified the defendant and did so without any hesitation, and only a short amount of time had elapsed between the commission of the robbery and B's identification of the defendant.

There was no merit to the defendant's claim that the reliability of B's identification was undermined by the application of certain estimator variables, which are factors that stem from conditions over which the criminal justice system has no control and generally arise out of the circumstances under which the eyewitness viewed the perpetrator during the commission of the crime, and which this court identified in *State* v. *Harris* (330 Conn. 91) as additional considerations for evaluating the reliability of an identification under the state constitution.

There was, at best, conflicting evidence regarding whether B was high from smoking marijuana when she identified the defendant, although there was evidence that B was scared, being scared, in and of itself, does not render an identification unreliable, and the evidence did not support the defendant's contention that B was so focused on a gun handled by the perpetrators during the robbery that her identification was rendered unreliable.

Moreover, although the police did not employ a double-blind, sequential identification procedure, the challenged showup procedure occurred within eighty-six minutes of the robbery, and social science has demonstrated that there is no greater likelihood of misidentification when a showup rather than a lineup procedure is employed, so long as the showup identification occurs less than two hours after the witness viewed the perpetrator.

(*Three justices dissenting in one opinion*)

Argued November 15, 2023, and January 29, 2025—
officially released July 22, 2025

*Procedural History*

Substitute information charging the defendant with four counts of the crime of unlawful restraint in the first degree and one count each of the crimes of robbery in the first degree, conspiracy to commit robbery in the first degree, criminal possession of a firearm, carrying a pistol without a permit, larceny in the fourth degree, and conspiracy to commit larceny in the fourth degree, brought to the Superior Court in the judicial district of Ansonia-Milford, where the court, *P. Brown, J.*, denied the defendant's motion to suppress certain evidence;

thereafter, the case was tried to the jury before *P. Brown, J.*; verdict and judgment of guilty of four counts of unlawful restraint in the first degree and one count each of robbery in the first degree, conspiracy to commit robbery in the first degree, criminal possession of a firearm, carrying a pistol without a permit, and conspiracy to commit larceny in the fourth degree, from which the defendant appealed to the Appellate Court, *Alvord*, *Seeley* and *DiPentima, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom, on the brief, was *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. A jury found the defendant, Gregory E. McLaurin, guilty of numerous offenses related to a 2018 robbery of a Smashburger restaurant in Milford.[1]

---

[1] The defendant was found guilty of robbery in the first degree with a deadly weapon in violation of General Statutes § 53a-134 (a) (2), conspiracy to commit robbery in the first degree with a deadly weapon in violation of General Statutes § 53a-48 and § 53a-134 (a) (2), criminal possession of a firearm in violation of General Statutes (Rev. to 2017) § 53a-217 (a), carrying a pistol without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a), four counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and conspiracy to commit larceny in the fourth degree in violation of § 53a-48 and General Statutes § 53a-125.

The defendant listed on his appeal form the docket number corresponding to the judgment pertaining to the finding that he violated his probation, in addition to the docket number pertaining to his conviction of the foregoing offenses, but he has failed to brief any claim relating to that judgment. We therefore consider any claim concerning that judgment to be abandoned. See, e.g., *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 306 Conn. 304, 319, 50 A.3d 841 (2012) ("[a]n appellant who fails to brief a claim abandons it" (emphasis omitted; internal quotation marks omitted)), cert. denied, 569 U.S. 918, 133 S. Ct. 1809, 185 L. Ed. 2d 812 (2013).

On appeal to the Appellate Court, the defendant claimed that the trial court had deprived him of his right to due process under the federal constitution by denying his motion to suppress a one-on-one showup identification of him by a restaurant employee. See *State* v. *McLaurin*, 216 Conn. App. 449, 466, 285 A.3d 104 (2022). The Appellate Court affirmed the trial court's judgment of conviction, concluding that the exigencies of the investigation justified the police's use of the showup identification procedure and, therefore, that the identification was not unnecessarily suggestive. See id., 466, 470, 479. We granted the defendant's petition for certification to appeal, limited to the issue of whether the Appellate Court properly upheld the trial court's denial of his motion to suppress.[2] See *State* v. *McLaurin*, 346 Conn. 903, 287 A.3d 136 (2023). We affirm the judgment of the Appellate Court and conclude that the defendant's constitutional right to due process was not violated because, even if the identification procedure was unnecessarily suggestive, the identification was reliable.

The Appellate Court's opinion sets forth a more detailed recitation of the facts and procedural history. See *State* v. *McLaurin*, supra, 216 Conn. App. 451–65. We provide a summary herein, as supplemented by the record and the trial court's articulation. One evening in January, 2018, at approximately 8:30 p.m., the defendant and Royshon Ferguson entered the Smashburger restaurant. They were wearing ski masks, but their eyes, mouths, and the skin around their eyes and mouths were visible. The defendant carried a semiautomatic gun. Three employees were working at the restaurant that night. Two of the employees, Jada Brinkley and Jamal McNeil, were working in the front of the restau-

---

[2] After a panel of this court heard the initial oral argument, we ordered the trial court to issue an articulation, which the trial court did on November 25, 2024. We also ordered the parties to appear for reargument on January 29, 2025.

rant. One employee, Casey Deloma, was working in the back room, where a small safe was located. When Ferguson and the defendant entered the restaurant, four customers were dining in the front of the restaurant. Two of the customers attempted to flee, but the defendant pointed the gun at them and told them, "don't run." He then directed Brinkley, McNeil, and all of the customers to the back room of the restaurant at gunpoint.

In the back room, the defendant handed the gun to Ferguson, who pointed it at Deloma and demanded that she unlock the safe. Deloma made two unsuccessful attempts to unlock the safe. After the second attempt, Ferguson said, "I'm going to give you ten seconds, or I'm going to shoot you." Deloma then attempted to unlock the safe a third time and was able to successfully open it. Ferguson took the money out of the safe and put it in his pockets. While this was happening, the defendant was standing next to Brinkley in the back room.

After stealing the money from the back room safe, Ferguson took Deloma to the front of the restaurant at gunpoint and demanded that she open the cash registers. She opened one register, and Ferguson stole the money inside of it. The defendant remained in the back room of the restaurant and demanded that Brinkley, McNeil and the customers give him their cell phones.

As Deloma was opening the second register, one of the customers, Garfield Stewart, who was lawfully carrying a concealed firearm, drew his gun on the defendant. The defendant immediately ran to the front of the restaurant and out the front door, leaving Ferguson behind. Stewart, who had followed the defendant to the front of the restaurant, then pointed his gun at Ferguson. Stewart began "bang[ing]" Ferguson's hand until Ferguson released the gun he was holding. Fergu-

son then ran out of the restaurant, exiting within seconds of the defendant.

At approximately 8:40 p.m., the Milford Police Department received a call informing it that an armed robbery was in progress at the Smashburger restaurant. Officer Matthew Joy was dispatched to the scene and arrived approximately three minutes after the call, at approximately 8:43 p.m. Immediately after arriving at the restaurant, he located a gun on the floor, behind the front counter. After speaking with the employees and customers, he learned that two suspects had fled the restaurant on foot and that they had turned right after they exited through the front door. Officer Joy interviewed Brinkley, who told him that the suspects were two Black males. One suspect, later identified as Ferguson, was described as "a Black male, about five feet, six inches, heavyset, wearing jeans and a dark-colored . . . hooded sweatshirt . . . ." The other suspect, later identified as the defendant, was described as "a Black male, approximately six feet, six foot one, [with] a thinner build, wearing jeans [and] a red, hooded sweatshirt with a dark-colored topcoat layer." The eyewitnesses told Officer Joy that the suspects were wearing dark-colored ski masks, one black and one green.

Officer Joy promptly relayed a description of the suspects to his fellow officers. Shortly thereafter, a passing motorist flagged down police officers in the vicinity and reported that he had just seen two Black males run into a wooded area, behind a car dealership and a storage facility, which were located approximately 800 feet across the street from the Smashburger restaurant. Responding officers eventually located Ferguson in the woods. When they found him, he had an eight to nine inch kitchen knife and $868 on his person.

At 8:50 p.m., Officer Joy, who had remained on scene at the restaurant, received a radio transmission informing

him that other officers had apprehended a suspect. Sergeant Christopher Dunn, Officer Joy's commanding officer, instructed him to conduct a showup identification procedure with one of the eyewitnesses. Officer Joy selected Brinkley because she was the employee closest to the front of the restaurant when the suspects entered the restaurant, she was the first employee to encounter the suspects, she was able to give a description of the suspects, and she had been standing next to the defendant in the back room for a period of time. Prior to conducting the showup procedure, Officer Joy read the instructions for the showup to Brinkley. At no point did Officer Joy communicate to Brinkley that the police had one of the men responsible for the robbery in custody. Officer Joy drove Brinkley from the restaurant to the rear parking lot of the nearby car dealership in his cruiser, which took approximately one minute. The parking lot was well lit. At approximately 9:12 p.m., Brinkley positively identified Ferguson. Meanwhile, other officers continued to search for the second suspect.

About thirty minutes later, at 9:42 p.m., Officer Joy learned that other officers had detained a second suspect at the car dealership's parking lot. Officer Joy brought Brinkley back to the parking lot to conduct a second showup identification procedure. Once there, Officer Joy proceeded to the same location where Brinkley previously had identified Ferguson. Brinkley was seated in the rear of the driver's seat and viewed the defendant out of the open window. The area remained well lit. The defendant was seated in the back of an ambulance, approximately two to three car lengths from Officer Joy's cruiser. Officer Joy did not recall whether the defendant was handcuffed at the time or whether there were officers standing near the defendant. At approximately 9:56 p.m., Brinkley identified the defendant as the second suspect; she did not hesitate in making the identification.

Prior to trial, the defendant filed a motion to suppress the identification evidence of him on the grounds that it was improper, unreliable, and unnecessarily suggestive. At the hearing on the motion to suppress, the state presented testimony from Officer Joy and Brinkley. Officer Joy testified that exigent circumstances necessitating a showup identification of the defendant existed. Specifically, he testified that an armed robbery had just occurred and that the suspects had left the scene of the crime on foot. After one suspect was detained, there was concern that the other suspect could still have other weapons on his person. Officer Joy explained that, during the course of the investigation, he learned that Ferguson had been apprehended with a knife and that he did not know how many weapons were involved in the incident. Officer Joy further testified that it was important to eliminate the defendant as a suspect in the event that the perpetrator remained in the community.

At the suppression hearing, Brinkley testified that she did not have any memory of the event or the night in question because she had recently been in a major car accident and smokes marijuana. Brinkley testified that she "[m]ost likely" smoked "weed" on the day of the robbery but ultimately stated that she did not know if she had done so.

The state also presented four clips of footage from the body camera (body cam) worn by Officer Joy on the night of the incident, Brinkley's written statement from the night of the incident, and other exhibits. In the body cam footage, Brinkley identified Ferguson and the defendant, and discussed the suspects' physical features and clothing. At the hearing, Brinkley confirmed that it was her voice and image in the body cam footage, but she maintained that she had no recollection or memory of the night of the robbery.

In her written statement, Brinkley described the appearance of the robbers and detailed their actions

during the robbery. See footnote 4 of this opinion. During the hearing, Brinkley confirmed that she wrote and signed the statement but said that she had no recollection of writing the statement or the contents of the statement. Brinkley also confirmed that she had signed and dated the document containing the eyewitness instructions for identification procedures, which Officer Joy testified that he had read to Brinkley prior to her identification of the defendant, but said that she did not remember them either.

The trial court denied the defendant's motion to suppress, concluding that "the identification, given all the facts and circumstances, was not unduly suggestive."[3]

At trial, Brinkley testified that she had recently been involved in an automobile accident and had no memory of the night of the incident because of that accident and her frequent marijuana use. On cross-examination, Brinkley further testified that she "most likely" smoked "weed" on the day of the robbery because she "get[s] high almost every day . . . ." She stated, "I don't remember too much . . . ." Detective Sergeant Michael Cruz testified that he spoke with Brinkley on the night of the robbery and that Brinkley did not appear to be under the influence of any drugs that evening. Detective Sergeant Cruz also testified that he did not have any concern about Brinkley's participation in the showup identification procedure that night.

[3] "Prior to filing his brief in the [Appellate Court], the defendant filed a motion for articulation pursuant to Practice Book [2021] § 66-5. The defendant presented several questions for articulation, including, '[w]hat subordinate findings, if any, did the trial court make to support its determination that Brinkley's identification "was not unduly suggestive?"' The state did not oppose this particular request for articulation. The court denied the defendant's motion for articulation. [The Appellate Court] granted the defendant's motion for review of the denial of his motion for articulation but denied the relief requested therein." *State* v. *McLaurin*, supra, 216 Conn. App. 462 n.9. Nevertheless, as we explain herein, this court, sua sponte, ordered the trial court to issue an articulation in this case.

Based on Brinkley's testimony, the trial court admitted into evidence, pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), her signed written statement that she had given to the police on the night of the robbery. After the court admitted the statement, Brinkley read the statement into the record.[4] The prosecutor also introduced into evidence the four video clips that were recorded on Officer Joy's body cam. In the first two clips, Brinkley can be heard identifying Ferguson. In the third clip, Brinkley can be seen and heard discussing the color of the mask worn by the "skinny" perpetrator. In the fourth clip, Brinkley can be heard identifying the defendant. When asked if she recognized the suspect's clothing, she stated: "Yep . . . I see. Can you put the light on his jeans?" Once the perpetrator stood up, Brinkley can be heard saying: "Yep, that's him." When asked how sure she was, she can be heard saying: "Yup, I'm sure."

---

[4] Brinkley's recitation of her statement was as follows: "On this day, January 19, 2018, at approximately 8:30 [p.m.], I was cleaning tables in the restaurant. As I was getting ready to walk in the back to grab a rag, I saw the door swing open, and then came two Black men, [one was] heavyset . . . with a dark blue hoodie, dark skin . . . and a mask; the other male was skinny, lighter skin, with a dark green mask, red camouflage coat on. I saw the gun in the skinny one's hand, and I immediately went to the back to let my coworkers know what was behind me. I showed him where the safe was. He grabbed my arm [and] walked me . . . [Deloma], [and McNeil] further to the back, where the safe was located. Then he pulled out the gun again and demanded someone to open the safe. [There] was silence. He started pointing the gun at everyone. [Deloma] asked, do you want me to open it and went to put the code in. She put it in a couple of times, but [the safe] didn't open. The heavy male then said she had ten seconds to open it or he was going to shoot her. She put the code in again, and the safe opened. He grabbed the drawer and started taking the money. Then, along came the skinny individual, with the four customers. The heavyset male took [Deloma] back to the front to empty out the registers. Meanwhile, [as] the skinny one was taking more money, he noticed one of the customers moving, and, before you know it, the customer pulled out his gun and started to chase the robber. [McNeil] told me to call the police. I stayed in the back until [McNeil] came there again, [and] I [knew that] it was clear [and] that the robbers were gone."

The jury found the defendant guilty of all counts, except for larceny in the fourth degree. See footnote 1 of this opinion. The trial court sentenced the defendant to twenty-five years of incarceration, execution suspended after eighteen years, and five years of probation.

Before the Appellate Court, the defendant claimed that the trial court should have granted his motion to suppress Brinkley's identification because the showup procedure utilized by the police was unnecessarily suggestive, and, as a result, the identification was unreliable. *State* v. *McLaurin*, supra, 216 Conn. App. 466. "After setting forth his general contention that showup identifications are 'widely condemned' because they are inherently and significantly suggestive"; id., 468; and arguing that the exigency " 'exception' " permitting their use was intended to be a narrow one; id.; the defendant claimed that the procedure by which Brinkley had identified him was unnecessarily suggestive for three reasons: (1) the police officers involved admitted at the suppression hearing that they did not need to use a showup identification procedure, (2) approximately ninety minutes elapsed between the crime and when Brinkley identified him, which, according to the defendant, belied the state's claim of exigency, and (3) the showup procedure was "conducted . . . in a suggestive place and staged . . . in a suggestive manner." (Internal quotation marks omitted.) Id., 468–69.

The Appellate Court disagreed with each contention and, like the trial court, concluded that the showup identification procedure was not unnecessarily suggestive. See id., 470. Consequently, the Appellate Court had no occasion to address whether the identification was otherwise reliable. See id., 479 n.23. Ultimately, the Appellate Court affirmed the judgment of the trial court. Id., 479.

The defendant filed a petition for certification to appeal, which we granted, limited to the following issue:

"Did the Appellate Court properly uphold the trial court's denial of the defendant's motion to suppress the one-on-one showup identification of the defendant?" *State* v. *McLaurin*, supra, 346 Conn. 903.

On appeal to this court, the defendant asserts that the Appellate Court incorrectly concluded that the challenged showup identification procedure was not unnecessarily suggestive. The defendant also urges this court to overrule its precedent holding that, on the heels of an armed robbery (or commission of another dangerous felony), a pretrial showup procedure in close temporal and geographic proximity to the crime is not unnecessarily suggestive in light of the exigencies of the criminal investigation. See, e.g., *State* v. *Revels*, 313 Conn. 762, 773–74, 99 A.3d 1130 (2014) (showup identification procedure was not unnecessarily suggestive when police reasonably believed that perpetrator "was likely . . . on the run, in the area, and armed," and "[s]afeguarding the public from a possibly armed and dangerous fugitive was an immediate and pressing need"), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). The defendant asserts that this court's precedents improperly equate exigency with convenience, and he urges us to adopt a more stringent standard for the admission of showup identification evidence. The defendant argues that, since *Stovall* v. *Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), courts improperly have expanded the notion of what constitutes an exigency to include "a myriad" of situations that, in his view, are not exigent. In order to effectuate the demands of the fourteenth amendment to the federal constitution, he contends, this court should adopt a "prophylactic" exclusionary rule limiting the use of showup identification procedures to "true exigencies . . . ." Under his proposed rule, showup identifications would be admissible only when (1) as in *Stovall* v. *Denno*, supra, 302, a showup procedure is " 'the only feasible

procedure' " in light of a gravely injured witness, (2) the police lack probable cause to detain a suspect, or (3) the police are in pursuit of "an armed suspect who has harmed, or tried to harm," a member of the public. Adopting such a rule, the defendant argues, will not prevent the police from conducting showup procedures in other situations, but it will simply preclude the state from using those identifications in court.

The state contends that the Appellate Court properly affirmed the judgment of the trial court, concluding that the showup identification procedure was not unnecessarily suggestive and, therefore, does not violate the due process clause of the fourteenth amendment to the United States constitution. In the alternative, the state asserts that the challenged identification was reliable. The state further asserts that we should not adopt the prophylactic rule urged by the defendant. Specifically, the state contends that there is no merit to the defendant's claim that courts disdain showup identifications, as courts uniformly have approved the use of showup identifications in appropriate circumstances, and, indeed, "each of the jurisdictions relied [on] by the defendant to support his claim of universal disdain [for showup identifications has], like Connecticut, approved of [their use] under facts analogous to this case . . . ." The state further contends that "[n]othing in the [United States] Supreme Court precedent supports the defendant's contention that there must be a clear lack of probable cause [to make an arrest], a gravely injured witness, or armed suspects who have tried to harm someone before a showup" procedure may be conducted. Relying on *Simmons* v. *United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), in which the court was "unwilling to prohibit [the use of an allegedly unnecessarily suggestive identification procedure], either in the exercise of [its] supervisory power or, still less, as a matter of constitutional requirement"; id., 384; the state argues

that "the [United States] Supreme Court has long recognized that the use of a suggestive identification procedure may be necessary and, thus, comport with due process, when officers are searching for fleeing suspects shortly after a crime and need to quickly determine if they are on the right track or need to keep searching."

On November 15, 2023, a panel of this court consisting of then Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy heard the first oral argument in this matter. On September 17, 2024, this court notified the parties that retired Chief Justice Robinson and Justice Alexander would be replaced by Judges Clark and Westbrook and ordered the parties to appear for a rehearing. Before that hearing took place, pursuant to Practice Book § 60-5, we, sua sponte, ordered the trial court to articulate the following: (1) "What subordinate findings did the trial court make to support its determination that Brinkley's identification 'was not unduly suggestive?' In particular, what portions of Officer Joy's and . . . Brinkley's testimony did the court credit and what portions, if any, did the court reject? The court should also articulate any other findings of fact necessary to support its determination." (2) "Assuming the identification was unduly or impermissibly suggestive, articulate whether, under the totality of the circumstances, the identification was still reliable and the facts that support such a conclusion." And (3) "[a]rticulate the factual basis that supports the conclusion that an exigency existed under the circumstances of this case that justified the showup identification." The trial court issued its articulation on November 25, 2024. Thereafter, on January 29, 2025, this court heard a second argument with the newly constituted panel. Additional facts will be set forth as necessary.

## I

Whether a pretrial identification procedure violates a defendant's right to due process is a mixed question

of law and fact subject to this court's plenary review. See, e.g., *State* v. *Marquez*, 291 Conn. 122, 136–37, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Because the suggestiveness and reliability of an identification procedure implicate a defendant's constitutional right to due process, we must examine the record scrupulously to determine whether the facts found by the trial court are supported by substantial evidence. See, e.g., id., 137. Nonetheless, "we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *St. John*, 282 Conn. 260, 277, 919 A.2d 452 (2007).

"The test for determining whether the state's use of an [allegedly] unnecessarily suggestive identification procedure violates a defendant's federal due process rights derives from the decisions of the United States Supreme Court in *Neil* v. *Biggers*, 409 U.S. 188, 196–97, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *Manson* v. *Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). As the court explained in *Brathwaite*, fundamental fairness is the standard underlying due process, and, consequently, 'reliability is the linchpin in determining the admissibility of identification testimony . . . .' Id., 114. Thus, 'the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on [an] examination of the totality of the circumstances.' . . . *State* v. *Marquez*, [supra, 291 Conn. 141]." *State* v. *Harris*, 330 Conn. 91, 101, 191 A.3d 119 (2018).

"With respect to the first prong of this analysis, [b]ecause, [g]enerally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, [it] . . . is limited to identification testimony [that] is manifestly suspect

. . . . [Consequently] [a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . We have recognized that [ordinarily] a one-to-one confrontation between a [witness] and the suspect presented . . . for identification is inherently and significantly suggestive because it conveys the message to the [witness] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Ruiz*, 337 Conn. 612, 622, 254 A.3d 905 (2020), quoting *State* v. *Revels*, supra, 313 Conn. 772–73; see also, e.g., *Neil* v. *Biggers*, supra, 409 U.S. 198 ("[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous"). For this reason, when not necessary, "the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented [by] the police, only one of whom is the suspect) . . . has . . . been widely condemned . . . ." (Citations omitted; internal quotation marks omitted.) *Brisco* v. *Ercole*, 565 F.3d 80, 88 (2d Cir.), cert. denied, 558 U.S. 1063, 130 S. Ct. 739, 175 L. Ed. 2d 542 (2009).

It is well established, however, that the use of a one-on-one showup identification procedure does not invariably constitute a denial of due process, as it may be justified by exigent circumstances. See, e.g., *State* v. *Revels*, supra, 313 Conn. 773–74; *State* v. *Wooten*, 227 Conn. 677, 686, 631 A.2d 271 (1993). Thus, a showup identification procedure conducted in close temporal and geographic proximity to the offense may be deemed reasonable and, therefore, permissible for federal due process purposes when "it was prudent for the police to provide the victim with the opportunity to identify [his or] her assailant while [his or] her memory of the incident was still fresh . . . and . . . [the procedure]

was necessary to allow the police to eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay, if the victim excluded the defendant as a suspect or was unable to identify him." (Citation omitted; internal quotation marks omitted.) *State* v. *Wooten*, supra, 686; accord *State* v. *Ledbetter*, 275 Conn. 534, 551, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

Moreover, when the police take prompt steps to identify a detained suspect in order to achieve these objectives, the use of handcuffs and illumination does not necessarily render the identification unduly suggestive. See, e.g., *United States* v. *Bautista*, 23 F.3d 726, 730 (2d Cir.) ("The fact that the suspects were handcuffed, in the custody of law enforcement officers, and illuminated by flashlights . . . did not render the [pretrial] identification procedure unnecessarily suggestive. . . . Because the on-the-scene identification was necessary to allow the officers to release the innocent, the incidents of that identification were also necessary."), cert. denied sub nom. *Minier-Contreras* v. *United States*, 513 U.S. 862, 115 S. Ct. 174, 130 L. Ed. 2d 110 (1994); see also, e.g., *State* v. *Revels*, supra, 313 Conn. 767, 774 (showup identification procedure was not unnecessarily suggestive, even though identification took place while "the defendant was standing in the middle of the road, handcuffed and surrounded by uniformed police officers . . . [one of whom] directed [a] spotlight on his cruiser toward the [defendant]").

## II

The defendant claims that his right to due process was violated because the showup identification procedure used in the present case was unnecessarily suggestive. We acknowledge that the showup procedure in

the present case was suggestive. Indeed, this court has frequently acknowledged that showup identification procedures are "inherently and significantly suggestive . . . . We also have recognized, however, that the existence of exigencies may preclude such a procedure from being *unnecessarily* suggestive." (Emphasis in the original; internal quotation marks omitted.) *State* v. *Revels*, supra, 313 Conn. 772–73. We need not determine whether the showup procedure was unnecessarily or unduly suggestive in the present case, however, because, even if we assume, arguendo, that it was, the trial court correctly concluded that Brinkley's identification of the defendant was reliable under all of the relevant circumstances.[5] See, e.g., *State* v. *Ruiz*, supra, 337 Conn. 624 ("[w]e need not opine on the propriety of the procedure used by the police . . . because, even if we were to assume . . . that it was unnecessarily suggestive, [the] identification of the defendant was reliable under all of the relevant circumstances"); see also, e.g., *Van Pilon* v. *Reed*, 799 F.2d 1332, 1339 (9th Cir. 1986) (court may assume suggestiveness arguendo and review reliability); *Bonderer* v. *Jones*, Docket No. 2:20-cv-0415 DAD AC, 2024 WL 4453461, *6 (E.D. Cal. October 9, 2024) (court did not need to determine whether single photograph identification procedure was unduly suggestive because, assuming it was, identification itself was nevertheless reliable under totality of circumstances).

The following additional facts are necessary for our resolution of this issue. In its articulation, the trial court

---

[5] Because we assume, without deciding, that the showup identification procedure was unnecessarily suggestive but conclude that the identification was nevertheless reliable under the totality of the circumstances, we do not address the defendant's contention that we should adopt a prophylactic rule, under the federal due process clause, barring the admission of identifications obtained through a showup procedure unless the police conducted the showup procedure to accommodate a gravely injured witness, there was a lack of probable cause to arrest a suspect, or an armed suspect had harmed (or attempted to harm) a member of the public.

explained that, "[a]ssuming [this] court finds [that] the [showup] identification was unduly or impermissibly suggestive, the [trial] court articulates how, under the totality of the circumstances, the identification was still reliable.

"The identification was conducted in close temporal and geographical proximity to the alleged offense: an armed robbery in progress call was received by the police at 8:40 p.m., and . . . Brinkley was brought to the [car] dealership to conduct an identification at 8:50 p.m.; she identified . . . Ferguson at 9:12 p.m.; she was returned to the dealership at 9:42 p.m. for a second identification, and she identified the defendant at 9:56 p.m. . . . The restaurant was described as being across the street from the dealership, about [one] tenth of a mile away . . . . The police provided . . . Brinkley an opportunity to identify the defendant while her memory was still fresh. . . . Brinkley identified both suspects quickly and without hesitation. Officer Joy testified [that] a firearm was found on the floor of the restaurant, behind the front counter . . . . The court recalls in . . . Brinkley's statement that the skinnier suspect (identified as the defendant) was in possession of a gun at the time of the robbery . . . . Officer Joy also testified that . . . Ferguson was found with a knife on his person when he was apprehended. Officer Joy also stated [that] he did not know how many weapons were involved in this incident . . . ." (Citations omitted.)

Furthermore, the trial court explained in its articulation that it "credited all of the testimony of Officer Joy and . . . Brinkley and did not reject any of it. The court noted the issues . . . Brinkley herself raised regarding her lack of present memory, frequent marijuana use, and the possibility [that] she was not wearing glasses on the night of the incident."

This court has explained that, to determine whether an identification from an unnecessarily suggestive procedure is reliable for federal constitutional purposes, we look at the totality of the circumstances. See, e.g., *State* v. *Ruiz*, supra, 337 Conn. 624. To assist us, we examine the following factors (known as the *Biggers* factors): " '[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his [or her] prior description of the criminal, [4] the level of certainty demonstrated at the [identification], and [5] the time between the crime and the [identification]. *Manson* v. *Brathwaite*, supra, [432 U.S.] 114, citing *Neil* v. *Biggers*, supra, [409 U.S.] 199–200.' . . . *State* v. *Harris*, supra, 330 Conn. 108." *State* v. *Ruiz*, supra, 624–25.

We use these factors to guide our scrupulous review of the record to determine whether substantial evidence in the record supports the trial court's finding that Brinkley's identification of the defendant was reliable. We conclude that the relevant factors in the present case support the conclusion that the challenged identification was reliable.

First, we consider the opportunity of the witness to view the criminal at the time of the crime. The evidence established that Brinkley was in the front of the restaurant when Ferguson and the defendant entered, and that she then went into the back of the restaurant with them and stood next to the defendant while Ferguson ordered Deloma to open the safe. In addition, in its articulation, the trial court explained that Officer Joy testified that "[h]e [had] selected . . . Brinkley to participate in the identification because she was the employee closest to the front of the [restaurant, who] encountered the suspects first . . . ." (Citation omitted.) On the basis of this evidence, we conclude that the first factor weighs in favor of reliability.

Turning to the second factor, the witness' degree of attention, we conclude that this factor also weighs in favor of reliability. The evidence demonstrates that Brinkley was able to provide a detailed description of the perpetrators, which matched the appearance of Ferguson and the defendant on the night in question, and that she communicated with Officer Joy during his investigation. In its articulation, the trial court explained that "Officer Joy testified that he [had] interviewed . . . Brinkley prior to the identification. She told him there were two Black male suspects, one short and heavyset, the other tall and thinner. She stated [that] they were wearing masks when they entered the restaurant." Indeed, Brinkley's statement to the police contains a detailed description of the events of that night. See footnote 4 of this opinion.

We acknowledge that, during trial, Brinkley testified that she had an automobile accident prior to trial that impacted her memory of the robbery. Also, during cross-examination, Brinkley testified that she "most likely" was smoking marijuana on the night in question and was not sure whether she was wearing her eyeglasses. In its articulation, the trial court explicitly took into account Brinkley's testimony in this regard, but it relied on her "written statement, made contemporaneous[ly] [with] the events in question," and her detailed descriptions therein.

We next examine the accuracy of the witness' prior description of the defendant. In this case, Officer Joy testified that he had interviewed Brinkley and the other eyewitnesses before the identification. Brinkley had provided Officer Joy with a description of the suspects, one of which matched the general appearance of the defendant. Specifically, Brinkley had described one of the suspects as a skinny Black male, who wore a dark green mask and a red camouflage coat. See footnote 4 of this opinion. Brinkley's identification was consistent

with how the defendant appeared when he was located on the night of the robbery. Furthermore, in its articulation, the trial court explained that "Officer Joy testified [that] a firearm was found on the floor of the restaurant, behind the front counter . . . . The [trial] court recalls in . . . Brinkley's statement that the skinnier suspect (identified as the defendant) was in possession of a gun at the time of the robbery . . . ." (Citations omitted.) Accordingly, we conclude that the accuracy of Brinkley's identification of the perpetrators of the crime weighs in favor of the reliability of the identification.

The next factor to consider is the level of certainty demonstrated by Brinkley with respect to the identification. Officer Joy testified that Brinkley had identified the defendant without any hesitation, and Officer Joy recorded that identification in writing. Moreover, the video clips from Officer Joy's body cam demonstrate that Brinkley had identified the defendant with certainty on the night of the robbery. In its articulation, the trial court explained that the prosecutor introduced video from Officer Joy's body cam and asked Brinkley to identify her voice in the video. She did so, and the following statements were attributed to her: " 'Yup, that's him'; '[c]an you put a light on his face because he had on a mask?' And 'I saw your big ass, I saw you . . . yup, that's you.' " In addition, in the video, when Officer Joy asked Brinkley whether she took a good look at the individuals who robbed the restaurant, she answered in the affirmative. When asked, in the video, if she recognized the clothing, Brinkley responded, "yes." Furthermore, in the body cam video, when Officer Joy asked Brinkley whether she was sure that the defendant was one of the robbers, Brinkley responded, "I'm sure." (Internal quotation marks omitted.) Brinkley's statements in the body cam footage reveal that, at the time she identified the defendant, she did so with great certainty. Accordingly, we conclude that this factor weighs

in favor of the reliability of Brinkley's identification of the defendant.

The final factor to consider is the time between the crime and the identification. The evidence established that the Milford Police Department received a call at 8:40 p.m., informing it that an armed robbery was in progress. Brinkley identified the defendant a little more than one hour later, at approximately 9:56 p.m. Therefore, we conclude that the time between the crime and the identification was quite short and that this factor weighs in favor of reliability. See, e.g., *Morris* v. *Carey*, 438 Fed. Appx. 634, 636 (9th Cir.) (field showup did not violate due process when it "was held just one hour after the crime" and when "the witnesses spent time with [the] [p]etitioner during [the] crime in very close quarters . . . [and] had ample time to observe the uncovered portions of [the] petitioner's face and his clothing"), cert. denied, 565 U.S. 1041, 132 S. Ct. 589, 181 L. Ed. 2d 433 (2011).

Considering the totality of the circumstances, we conclude that Brinkley's identification of the defendant was reliable. Consequently, we agree with the Appellate Court that the trial court properly denied the defendant's motion to suppress Brinkley's identification because its use by the state did not violate the defendant's rights under the due process clause of the fourteenth amendment to the United States constitution. See *State* v. *McLaurin*, supra, 216 Conn. App. 451, 466.

On appeal, the defendant asserts that the trial court's determination that the identification was reliable is undermined by a review of the factors that this court identified in *State* v. *Harris*, supra, 330 Conn. 118–19, 131, 133, as additional considerations for reliability under our state constitution. We are unpersuaded.

In *Harris*, this court identified the analytical framework required by our state constitution "for evaluating

the reliability of an identification that is the result of an unnecessarily suggestive identification procedure." Id., 131. Relying on *State* v. *Henderson*, 208 N.J. 208, 288–89, 27 A.3d 872 (2011), this court, in *Harris*, explained that a court should consider how the reliability of an identification is affected by system variables, which are factors that are within the control of the criminal justice system, and estimator variables, which are factors that stem from conditions over which the criminal justice system has no control and typically arise out of the circumstances under which the eyewitness viewed the perpetrator during the commission of the crime. *State* v. *Harris*, supra, 330 Conn. 131; see also *State* v. *Guilbert*, 306 Conn. 218, 236 n.11, 49 A.3d 705 (2012).

Specifically, in *Harris*, this court held that a trial court should consider the following eight estimator variables identified in *State* v. *Guilbert*, supra, 306 Conn. 253–54: "(1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a per-

son seen in one context is confused with a person seen in another." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 118–19; see also id., 133.

Critically though, in *State* v. *Guilbert*, supra, 306 Conn. 218, we explained that, although the estimator variables "are widely accepted by scientists, they are largely unfamiliar to the average person, and, in fact, many of [those variables] are counterintuitive."[6] (Footnote omitted.) Id., 239. Because of the counterintuitive nature of estimator variables, we allow for the defendant to introduce expert testimony to help the fact finder evaluate the likelihood of misidentification. See id., 251–54.

Although we are skeptical that the defendant truly makes out a reviewable claim under the state constitution in the present case, the state has, in its brief, responded to the defendant's argument under the *Harris* factors. We thus address the dissent's state constitutional discussion and still conclude that the identification was reliable.[7] The defendant has not asked us to revisit the

---

[6] "For example, people often believe that the more confident an eyewitness is in an identification, the more likely the identification is to be accurate. Similarly, the average person is likely to believe that eyewitnesses held at gunpoint or otherwise placed in fear are likely to have been acutely observant and therefore more accurate in their identifications. . . . Yet none of these beliefs is true." *State* v. *Guilbert*, supra, 306 Conn. 240–41. But laypersons are unaware of the effect of the factors on the reliability of a witness' testimony in this regard.

[7] In his motion to suppress, the defendant claimed that the identification violated his rights under both the state and federal constitutions. Nevertheless, the defendant did not ask the trial court to make findings under *State* v. *Harris*, supra, 330 Conn. 131, with respect to any estimator variables or to introduce any expert testimony on the estimator variables or their import in this case. Indeed, in *Harris*, we explained that, for state constitutional purposes, "to obtain a pretrial hearing, the defendant has the initial burden of offering some evidence that a system variable undermined the reliability of the eyewitness identification. . . . If the defendant meets this burden, the state must then offer evidence demonstrating that the identification was reliable in light of all relevant system and estimator variables. . . . If the state adduces such evidence, the defendant must then prove a very substantial likelihood of misidentification. . . . If the defendant meets that burden

*Harris* factors or to adopt any additional factors to guide our review. Therefore, we do not.

It is important to note that, although *Harris* specifically allows for the defendant to introduce expert testimony on estimator variables, and these factors require the presentation of scientific evidence because they are unknown to the average fact finder, the defendant did not introduce any expert testimony. Despite his failure to introduce expert testimony on the *Harris* factors during the trial court proceedings, the defendant, on appeal, points to the following estimator variables as undermining the trial court's finding of reliability: "The decoupling of confidence and accuracy is one of 'eight estimator variables' that govern reliability under the state constitution. . . . The other relevant factors are: the negative impact on reliability if the witness was 'focus[ed] on a weapon'; the inability to accurately perceive and remember events due to 'high stress at the time of observation'; and the absence of a double-blind, sequential identification procedure." (Citation omit-

of proof, the identification must be suppressed." (Citations omitted.) Id.; see also, e.g., S*tate* v. *Perez-Lopez*, 218 Conn. App. 555, 562, 582–83, 293 A.3d 1 (agreeing with defendant that it was error for trial court not to apply burden shifting framework adopted in *Harris* in connection with his state constitutional due process claim that identification was not reliable but concluding that error was harmless), cert. denied, 348 Conn. 902, 301 A.3d 529 (2023).

In the present case, the defendant did not seek to invoke the burden shifting framework under *Harris*, and it is questionable whether he even satisfied the first step of that framework, namely, showing that a system variable rendered the identification unreliable. To be sure, in *State* v. *Henderson*, supra, 208 N.J. 208, the case we relied on in *Harris* to adopt the system and estimator variables rubric; see *State* v. *Harris*, supra, 330 Conn. 131; the New Jersey Supreme Court noted that a showup identification procedure conducted *within* two hours of a crime is not a system variable sufficient to trigger a hearing because it does not undermine the reliability of an identification. See *State* v. *Henderson*, supra, 260–61 (noting study showing that "showups performed within minutes of an encounter were just as accurate as lineups" and that showups conducted more than two hours after event lead to decreased reliability).

ted.) Specifically, the defendant asserts that "Brinkley was probably high, petrified and focused on a gun, and did not identify the defendant during 'a double-blind, sequential identification procedure.' "

We disagree. First, the evidence does not establish that Brinkley was "high" when she made the identification. Although Brinkley testified that she "probably" had smoked marijuana on the night in question, Brinkley also testified that she had no memory of the night of the incident. Moreover, Detective Sergeant Cruz, who interacted with Brinkley the night of the incident, testified that Brinkley did not appear to be "high" or under the influence of any drugs that night. So, at best, there is conflicting evidence. Second, although there was evidence presented at trial that Brinkley was scared, fear, in and of itself, does not render an identification unreliable. See, e.g., *State* v. *Wooten*, supra, 227 Conn. 681, 688 (victim's identification of defendant was reliable despite victim's observation of defendant during sexual assault in which he threatened her with "sharp metal object"); *State* v. *Scott*, 191 Conn. App. 315, 339–40, 214 A.3d 871 (witness identification was reliable even though witness was in " 'panic mode' " during robbery in which witness was threatened with gun), cert. denied, 333 Conn. 917, 216 A.3d 651 (2019). Third, the evidence demonstrates that, although there was a weapon involved in the crime, most of the time that Brinkley was standing next to the defendant in the brightly lit back room, he did not have the gun. In fact, shortly after bringing Brinkley and the other individuals to the back room, the defendant handed the gun to Ferguson, who led Deloma to the front of the restaurant. Therefore, the evidence does not support the defendant's contention that Brinkley was so focused on the gun that her identification was unreliable. Finally, although Brinkley did not identify the defendant in a double-blind, sequential identification procedure, the showup procedure occurred

within eighty-six minutes of the incident. Social science demonstrates that there is no greater likelihood for misidentification in a showup than in a lineup if the showup procedure took place less than two hours after the witness viewed the perpetrator. See A. Yarmey et al., "Accuracy of Eyewitness Identifications in Showups and Lineups," 20 Law & Hum. Behav. 459, 465, 468 (1996). But see *State* v. *Henderson*, supra, 208 N.J. 261 (showup identification procedures conducted more than two hours after event in question present heightened risk of misidentification).

The judgment of the Appellate Court is affirmed.

In this opinion D'AURIA, DANNEHY and CLARK, Js., concurred.