******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* YAMIL ROHENA (SC 21020)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

### *Syllabus*

Convicted of murder and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court. An eyewitness to the shooting, C, identified the defendant as the shooter from a photographic array that was shown to him by the police. Before trial, the trial court granted the defendant's motion to suppress C's out-of-court identification of the defendant on the ground that the procedure employed by the police to elicit that identification was conducted in an unnecessarily suggestive manner such that it was likely to lead to misidentification. At trial, however, the trial court granted the state's motion to allow C to make an in-court identification of the defendant. Thereafter, C testified before the jury and identified the defendant as the person who had shot the victim. On appeal, the defendant claimed that the trial court had violated his federal and state constitutional rights to due process by admitting C's in-court identification after suppressing C's out-of-court identification. *Held*:

The trial court did not violate the defendant's federal due process rights by allowing C to make an in-court identification of the defendant as the person who had shot the victim.

The record established by clear and convincing evidence that C had an independent basis for identifying the defendant that was untainted by the unnecessarily suggestive out-of-court identification procedure.

Specifically, C was personally familiar with the defendant, C had ample opportunity to view the defendant at and around the time of the murder and had a heightened degree of attention during the events at issue, which enabled C to recognize the defendant's face and voice and to recount some of the items of clothing the defendant had been wearing, and C expressed 100 percent certainty that the defendant was the person who had shot the victim.

Moreover, the foregoing factors were not outweighed by the corruptive effect of the suppressed out-of-court identification.

This court declined the defendant's request to reconsider this court's holding in *State* v. *Dickson* (322 Conn. 410), pursuant to which the admissibility of in-court identifications turns on whether there is a due process concern of a substantial likelihood of misidentification, and to adopt a new rule under the federal constitution pursuant to which in-court identifications that follow unnecessarily suggestive out-of-court identifications are precluded as a matter of law unless there is no factual dispute as to the identity of the perpetrator.

The trial court did not violate the defendant's due process rights under the state constitution by allowing C to make an in-court identification of the defendant.

This court declined the defendant's request to adopt, under the state constitution, a new rule pursuant to which in-court identifications that follow out-of-court identifications that are the product of an unnecessarily suggestive identification procedure are presumed inadmissible and pursuant to which the state bears the burden of proving by clear and convincing evidence that the in-court identification was nevertheless reliable.

Furthermore, after consideration of the relevant factors set forth in *State* v. *Geisle*r (222 Conn. 672) for construing the parameters of the protections afforded under the state constitution, this court concluded that, because the present case involved an eyewitness who was personally familiar with the defendant prior to the murder and the primary concern in eyewitness identification cases pertains to a witness' observation and subsequent identification of a stranger, reconsideration of the existing standard for admitting in-court identifications was not warranted.

Argued March 11—officially released May 26, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford, where the court, *Droney*, *J.*, granted the defendant's motion to suppress a witness' out-of-court identification and the state's motion to allow that witness to make an in-court identification; thereafter, the charge of murder was tried to the jury before *Droney*, *J.*; verdict of guilty; subsequently, the charge of criminal possession of a firearm was tried to the court, *Droney*, *J.*; finding of guilty; judgment of guilty in accordance with the jury's verdict and the court's finding, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Alexander A. Kambanis*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Kelly E. Davis*, senior assistant state's

attorney, and *Stacey Cox*, assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. This appeal requires us to consider the federal and state due process protections that apply when an eyewitness makes an in-court identification of a defendant following the suppression of an out-of-court identification of the defendant by that same witness. The defendant, Yamil Rohena, appeals from the judgment of conviction of murder in violation of General Statutes § 53a-54a (a) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), in connection with the fatal shooting of the victim, Kwadir Paris. On appeal, the defendant claims that the trial court violated his federal and state due process rights by admitting a witness' in-court identification of him after suppressing that witness' out-of-court identification of him as unnecessarily suggestive and unreliable. We conclude that the admission of the in-court identification did not violate the defendant's federal or state due process rights. Accordingly, we affirm the judgment of conviction.

The jury reasonably could have found the following facts. The victim resided in Hartford with his mother, Keela Fuller, his sister, Delicia Anderson, and Anderson's two children. Around 1 a.m. on January 4, 2020, Fuller and Tashaya Jenkins, the mother of the victim's child, had a physical altercation outside of the victim's residence. The victim, among others, was present during this altercation. The fight eventually ended, and Jenkins left the property. Shortly thereafter, Jenkins asked her cousin, Shamar Coachman-Brown, to accompany her back to the victim's residence to retrieve some belongings that she had left behind and believed the victim had in his possession. Coachman-Brown agreed, and, upon their arrival, Anderson answered the front door and declined to return Jenkins' belongings.

Jenkins and Coachman-Brown then walked to the intersection of Garden and Nelson Streets, where they

encountered the defendant, who is Jenkins' brother. Coachman-Brown was familiar with the defendant, who went by the street name "Moya," because he had previously dated Coachman-Brown's cousin and attended some family functions. For approximately three minutes, the defendant, Coachman-Brown, and Jenkins spoke while standing under the streetlights before deciding to return to the victim's residence to attempt again to retrieve Jenkins' belongings. On their way, Coachman-Brown asked the defendant whether he was carrying a gun, and the defendant replied, "no."

At around 1:30 a.m., Coachman-Brown and the defendant arrived at the victim's residence. The defendant went to the front door and spoke to Anderson, stating that he was looking for the victim on behalf of Jenkins. When Anderson informed the defendant that the victim was not home, he and Coachman-Brown began walking toward the front yard as the victim pulled his vehicle into the driveway. After the victim exited his vehicle, he had a brief conversation with the defendant before turning around to enter his residence. As the victim walked away, the defendant fired several shots at the victim's back, with one fatally wounding him. Coachman-Brown and the defendant immediately fled the scene in the same direction. The victim succumbed to his injuries shortly thereafter.

On January 9, 2020, Coachman-Brown was arrested on unrelated charges and was interviewed by the police about the victim's murder. During the interview, Coachman-Brown identified the defendant from a photographic array as the shooter. The state subsequently charged the defendant with murder and criminal possession of a firearm. The defendant elected to have the murder charge tried to a jury and the firearm charge tried to the court. Prior to trial, the defendant filed a motion to suppress Coachman-Brown's out-of-court identification on the ground that it was conducted in an unnecessarily suggestive manner that was likely to lead to misidentification. The state filed a motion to allow Coachman-Brown

to make an in-court identification of the defendant. The trial court granted both motions.

The central issue at trial was the identity of the shooter. Coachman-Brown testified before the jury and identified the defendant in the courtroom as the person who had shot the victim. The jury found the defendant guilty of murder, and the trial court subsequently found the defendant guilty of criminal possession of a firearm. The trial court rendered judgment accordingly and sentenced the defendant to a total effective term of forty-five years of imprisonment. This direct appeal followed. See General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court violated his federal due process rights by admitting Coachman-Brown's in-court identification after suppressing his out-of-court identification as unnecessarily suggestive and unreliable. The defendant argues that the trial court incorrectly found that Coachman-Brown had the necessary independent basis for identifying him in court because it failed to consider the corruptive effect of the suppressed out-of-court identification and placed undue emphasis on Coachman-Brown's prior familiarity with the defendant. We disagree and conclude that the trial court did not violate the defendant's federal constitutional rights by admitting Coachman-Brown's in-court identification.

On December 21, 2023, the trial court conducted a hearing on the defendant's motion to suppress Coachman-Brown's out-of-court identification. Evidence adduced at that hearing established that, on January 9, 2020, Coachman-Brown was arrested on unrelated charges and interviewed by Detective Michael Heselton about the victim's murder. Initially, Coachman-Brown denied his involvement in the murder. After Heselton threatened Coachman-Brown that he may "go to prison for the rest of [his] life" if he continued being dishonest, Coachman-Brown admitted that he was present during the shooting

and stated that the person who shot the victim was known as either "Moolah" or "L.A." Coachman-Brown then agreed to be shown a photographic array to identify the person who shot the victim.

Detective Michael Taylor subsequently administered a double-blind sequential photo array consisting of eight photographs. Coachman-Brown did not initially identify a suspect. Taylor then offered Coachman-Brown a second attempt at identification, handing him the stack of eight photos. At this point, Coachman-Brown began comparing the images before pointing to photo number four, which depicted the defendant. Coachman-Brown stated to Taylor: "I know who this is. . . . [T]his is my cousin's ex-boyfriend." Taylor replied, "[y]ou know this guy as Moya?" Coachman-Brown then stated, "I know him like Moolah or L.A. . . . [The person who shot the victim] looks similar. He looks similar to something like this, but I'm . . . positive this is not him, though. Honestly, he looks somewhat similar to this, but this is not him."

Following this exchange, Heselton returned to the interrogation room, and Coachman-Brown reiterated his statement that photo number four looked "similar" to the person who shot the victim. Heselton then asked: "Okay, you didn't see Moya in [the photo array]?" Coachman-Brown replied: "I see Moya. That's what I know him by, that's Moya." In response, Heselton accused Coachman-Brown of "playing games," and Coachman-Brown stated: "I'm telling you the truth. The only person . . . that I know that was in [the photo array] was Moya, but that wasn't [the person who shot the victim]."

Detective Frank Verrengia then joined Heselton and Coachman-Brown in the interrogation room, and, over the course of twenty-eight minutes, the detectives requestioned Coachman-Brown about the day of the murder. At first, Coachman-Brown repeated his assertion that the person who shot the victim was "Moolah." Heselton asked, "[a]re you sure he didn't say . . . Moya?" Coachman-Brown replied, "[i]t's between Moolah and Moya, but I believe [it's] Moolah." Heselton then stated:

"It's not Moolah. I need you to be honest with me now. You want to get yourself out of this or do you want to stay in here?" When Coachman-Brown did not provide any further information, the detectives accused him of lying and told him that he could be charged with conspiracy to commit homicide and spend at least thirty years in prison. Coachman-Brown then admitted that the defendant's name was "Moya" and that he was depicted in the photo array. Taylor subsequently readministered the photo array to Coachman-Brown, and he identified photo number four as depicting the person who had shot the victim.

Following argument by the parties on the defendant's motion to suppress, the trial court applied the burden shifting framework set forth in *State* v. *Harris*, 330 Conn. 91, 115, 131, 191 A.3d 119 (2018), and determined that the defendant met his initial burden of establishing that the out-of-court identification procedure was unnecessarily suggestive and the reliability of the resulting identification was undermined by the following facts: **(1)** the identification procedure was not fully administered in a double-blind manner, **(2)** Coachman-Brown was not provided with neutral preidentification instructions, **(3)** the detectives provided Coachman-Brown with feedback throughout the identification procedure, and **(4)** Coachman-Brown did not initially identify a suspect. The trial court next determined that the state had failed to demonstrate that the out-of-court identification was nevertheless reliable.[1] As a result of these findings, the trial court granted the defendant's motion to suppress the out-of-court identification.[2]

On the third day of trial, outside of the presence of the jury, the trial court conducted an evidentiary hearing

---

[1]Because the state failed to meet its burden, the trial court did not reach the third step of the *Harris* framework, namely, whether the defendant proved a very substantial likelihood of misidentification. See *State* v. *Harris*, supra, 330 Conn. 131.

[2]At trial, Heselton testified for the state, and defense counsel cross-examined him about the procedure used to conduct Coachman-Brown's out-of-court identification. Defense counsel then requested that the jury

on the state's motion to allow Coachman-Brown to make an in-court identification of the defendant. Coachman-Brown testified at the hearing that he had known of the defendant since 2014, when the defendant dated his cousin, and that he saw the defendant "once or twice" at family functions, as well as around the neighborhood. With respect to the day of the victim's murder, Coachman-Brown explained that he was with the defendant before and during the shooting, and he was able to recognize the defendant by his face and voice. Coachman-Brown also recalled some of the items of clothing the defendant was wearing at the time of the crime. He then testified that, during his interview on January 9, 2020, he initially lied to the detectives when he told them that the defendant was not in the photo array because he feared going to jail and facing retaliation. The trial court then stated: "I've got to make sure . . . whether or not, whatever you went through with the detectives [during your out-of-court identification], if that's influencing the identification you made today. How sure are you today that the defendant is the shooter?" Coachman-Brown replied, "I'm sure." He then expressed "100 percent" certainty that the defendant was the person who shot the victim.

In response to this testimony, defense counsel argued that Coachman-Brown had "exonerate[d]" the defendant during his first review of the photo array with the police. He contended that Coachman-Brown subsequently identified the defendant only because he feared prosecution in light of the statements made to him throughout the interview by Heselton and Verrengia. Defense counsel argued that any in-court identification made by

be allowed to view the portion of video recording during which Heselton and Verrengia requestioned Coachman-Brown about the murder prior to his identifying the defendant in the photo array. Defense counsel argued that the video would highlight to the jury the suggestiveness of the out-of-court identification. The prosecutor objected to the jury's viewing of the video. The trial court allowed the jury to watch the video but gave a limiting instruction that the video evidence could be used only to determine the weight given to other in-court testimony and could not be used for substantive purposes.

Coachman-Brown would be based on these same fears, rather than on Coachman-Brown's independent recollection.

The trial court granted the state's motion to allow Coachman-Brown to make an in-court identification of the defendant, concluding that, under the totality of the circumstances, "Coachman-Brown's in-court identification is based sufficiently [on] his independent recollection . . . and . . . untainted by . . . any faulty pretrial identification process . . . ." In support of its ruling, the trial court cited *State* v. *Williams*, 317 Conn. 691, 707, 119 A.3d 1194 (2015), and found that Coachman-Brown was "personally familiar" with the defendant, had ample opportunity to view the defendant prior to and at the time of the shooting, and was certain that the defendant was the person who had shot the victim.

We begin with the applicable standard of review. "Whether a[n] . . . identification procedure violates a defendant's right to due process is a mixed question of law and fact subject to this court's plenary review. . . . Because the suggestiveness and reliability of an identification procedure implicate a defendant's constitutional right to due process, we must examine the record scrupulously to determine whether the facts found by the trial court are supported by substantial evidence. . . . Nonetheless, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error."[3] (Citations omitted; internal quotation marks omitted.) *State* v. *McLaurin*, 352 Conn. 500, 514, 337 A.3d 1039 (2025).

Principles of due process underpin the admissibility of eyewitness identifications under the United States

[3]Throughout their appellate briefs, both the state and the defendant refer to an abuse of discretion standard of review. Although we acknowledge that nonconstitutional claims concerning eyewitness identification evidence are reviewed for an abuse of discretion; see, e.*g*., *State* v. *Perez-Lopez*, 218 Conn. App. 555, 601–602, 293 A.3d 1, cert. denied, 348 Conn. 902, 301 A.3d 529 (2023); the substance of the defendant's claims implicate his federal and state due process rights. Accordingly, we view them as presenting a mixed question of law and fact subject to plenary review. See, e.g., *State* v. *McLaurin*, 352 Conn. 500, 514, 337 A.3d 1039 (2025).

constitution. See, e.g., *Neil* v. *Biggers*, 409 U.S. 188, 196–98, 93 S. Ct. 375, 34 L. Ed. 2d. 401 (1972). It is well settled that "[i]t is the likelihood of misidentification [that] violates a defendant's right to due process"; id., 198; and, as a result, "reliability is the linchpin in determining the admissibility of identification[s] . . . ." *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). Pursuant to these principles, whether an identification procedure violates a defendant's federal due process rights presents a two-pronged inquiry made on a case-by-case basis: "[F]irst, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on [an] examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Marquez*, 291 Conn. 122, 141, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). An out-of-court eyewitness identification, therefore, is excluded "only if . . . the procedure was so suggestive and otherwise unreliable as to give rise to a very substantial likelihood of irreparable misidentification." (Emphasis omitted.) Id., 142.

"A different standard applies when the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor. In such cases, both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification." *State* v. *Dickson*, 322 Conn. 410, 420, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). As the Appellate Court explained in *State* v. *Salmond*, 179 Conn. App. 605, 180 A.3d 979, cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018), when an eyewitness' out-of-court pretrial identification has been excluded from evidence as both unnecessarily suggestive and unreliable, any subsequent in-court identifications may not be admitted without first determining that they are not tainted by the illegal identification but are of independent

origin. Id., 617; see also *Gilbert* v. *California*, 388 U.S. 263, 272, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967). "Thus, the burden [is] on the state to establish by clear and convincing evidence that the subsequent [in-court identification is] based on the [witness'] independent recollection." (Internal quotation marks omitted.) *State* v. *Salmond*, supra, 617; see also *State* v. *Mitchell*, 204 Conn. 187, 204, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); *State* v. *Guertin*, 190 Conn. 440, 459, 461 A.2d 963 (1983).

To assess the independent reliability of a subsequent in-court identification, we weigh "the corruptive effect of the [initial] suggestive procedure . . . against certain factors, such as the opportunity of the [witness] to view the criminal at the time of the crime, the [witness'] degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Salmond*, supra, 179 Conn. App. 617–18; see also *Neil* v. *Biggers*, supra, 409 U.S. 199–200. Courts may also consider the eyewitness' prior familiarity with the defendant in determining the reliability of the identification. See, e.g., *State* v. *Salmond*, supra, 618–19; *Patrick* v. *United States*, 343 A.3d 573, 587 (D.C. 2025); *Commonwealth* v. *Johnson*, 473 Mass. 594, 601–602, 45 N.E.3d 83 (2016); *People* v. *Williams*, 41 N.Y.3d 551, 557, 237 N.E.3d 1229, 214 N.Y.S.3d 289 (2024); see also *State* v. *Franqui*, 354 Conn. 423, 432–33, A.3d (2026).

Applying these principles to the present case, we conclude that the trial court did not violate the defendant's federal due process rights by admitting Coachman-Brown's in-court identification. The record establishes by clear and convincing evidence that Coachman-Brown had an independent basis for identifying the defendant,

which was untainted by the suggestive out-of-court identification procedure.

The trial court found that Coachman-Brown "was personally familiar with the defendant before the murder . . . ."[4] Coachman-Brown testified that he had known the defendant since 2014—for six years prior to the murder—and had seen him at family functions, as well as around the neighborhood. On the basis of these interactions, Coachman-Brown testified that he was able to recognize the defendant by his face and voice on the day of the murder. Put simply, Coachman-Brown "[was] familiar enough with the defendant that the risk of misidentification was small." *State* v. *Guilbert*, 306 Conn. 218, 261, 49 A.3d 705 (2012).

In addition to Coachman-Brown's prior familiarity with the defendant, the trial court made several additional findings, supported by the record, that constitute clear and convincing evidence of the independent reliability of the in-court identification. First, Coachman-Brown

[4]The defendant argues that the trial court improperly relied on *State* v. *Williams*, supra, 317 Conn. 691, in making this finding and erroneously overlooked this court's later decision in *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022). Neither case has any applicability to the defendant's claims on appeal. Although the court mentioned *Williams* in its ruling, it did so only as support for the proposition that "the Supreme Court has not articulated specific rules regarding the degree of familiarity that an eyewitness must have with a suspect." In *Williams*, in the context of determining whether the trial court had abused its discretion in excluding expert testimony on the fallibility of eyewitness identifications, we declined to articulate a specific rule for determining witness familiarity and, instead, described the "typical approach" for conducting the analysis. *State* v. *Williams*, supra, 707. In *Gore*, we discussed the degree of familiarity required for a nonpercipient witness' identification of the defendant from a surveillance video or photograph. *State* v. *Gore*, supra, 158–59. This case involves neither question. The defendant never offered an expert witness, and Coachman-Brown was a percipient eyewitness to the shooting. This case also does not present the question of a first-time, in-court identification that we addressed in *State* v. *Dickson*, supra, 322 Conn. 444–47, 452–53. Instead, the issue before the trial court was whether the unduly suggestive out-of-court identification tainted the in-court identification. See id., 420; *State* v. *Salmond*, supra, 179 Conn. App. 617–18. The record reflects that the trial court applied the correct analysis in deciding this issue.

had ample opportunity to view the defendant at the time of the murder. Not only did Coachman-Brown have "a front row seat to [the victim's] murder"; (internal quotation marks omitted) *State* v. *Salmond*, supra, 179 Conn. App. 619; but he also spent at least several minutes with the defendant immediately prior to the murder. Coachman-Brown testified that he spoke closely with the defendant for two to three minutes under streetlights at the intersection of Garden and Nelson Streets, walked with the defendant to the victim's residence, watched the defendant speak with the victim before the murder occurred, and fled the scene with the defendant. See, e.g., *Manson* v. *Brathwaite*, supra, 432 U.S. 114; *State* v. *Franqui*, supra, 354 Conn. 432. Second, Coachman-Brown had a heightened degree of attention during the events at issue. He testified that he recognized the defendant's face and voice, and he recounted some of the items of clothing the defendant was wearing. See *State* v. *Salmond*, supra, 619 (identification was reliable when eyewitness "recognize[d] the defendant by both his appearance and his voice"). Finally, Coachman-Brown expressed 100 percent certainty that the defendant was the person who had shot the victim. See, e.g., *Neil* v. *Biggers*, supra, 409 U.S. 200.

We disagree with the defendant's argument that these factors were outweighed by the corruptive effect of the suppressed out-of-court identification, namely, the "mugshot commitment effect."[5] See, e.g., *Young*

[5] The defendant argues that the trial court improperly failed to consider the corruptive effect of the suppressed out-of-court identification when ruling on the admissibility of Coachman-Brown's in-court identification. We disagree. To support this argument, the defendant cites one statement, divorced from context, made by the trial court during its ruling on this issue: "I am not considering the actual transcript of the full [January 9, 2020] interview. I am basing my [ruling] today on the testimony that I observed, in person, of . . . Coachman-Brown." The defendant fails to consider the entire record. During the trial court's hearing on the in-court identification, defense counsel made arguments with respect to the corruptive effect of the out-of-court identification, Coachman-Brown testified about the out-of-court identification, and the trial court, in its ruling, found that "the corruptive effect of the [January 9, 2020 interview] . . . did not

v. *Conway*, 698 F.3d 69, 82 (2d Cir. 2012) (mugshot commitment effect refers to phenomenon in which, "having identified [the defendant] as the perpetrator, [the witness] becomes attached to [his or] her prior identification . . . [and] is more likely to identify him again in a subsequent identification procedure, even if he is innocent"), cert. denied sub nom. *Unger* v. *Young*, 571 U.S. 1015, 134 S. Ct. 20, 187 L. Ed. 2d 409 (2013). Although the procedures employed during Coachman-Brown's out-of-court identification were improper, we are assured, on the basis of the facts that the trial court found, that the in-court identification was not tainted by those procedures. The trial court, therefore, properly admitted Coachman-Brown's in-court identification of the defendant.

The defendant also asks us to reconsider our holding in *State* v. *Dickson*, supra, 322 Conn. 410, and to adopt a new rule that precludes in-court identifications that follow unnecessarily suggestive out-of-court identifications as a matter of law, unless there is no factual dispute as to the identity of the perpetrator. Because we see no reason to depart from our current approach, under which the admissibility of an in-court identification turns on whether there is a due process concern of a substantial likelihood of misidentification; see id., 420; we decline to adopt the defendant's proposed per se rule as a matter of federal constitutional law.

II

The defendant next claims that the trial court violated his due process rights under the Connecticut constitution by admitting Coachman-Brown's in-court identification. To support this claim, the defendant argues that article first, §8, of the Connecticut constitution provides greater due process protection than does the federal constitution with respect to the admissibility of in-court identifications that follow the suppression of unnecessarily suggestive out-of-court identifications. Specifically, the

so infiltrate the identification today that it should be withheld from the jury."

defendant asks this court to adopt a more restrictive version of the independent source doctrine; see, e.g., *United States* v. *Wade*, 388 U.S. 218, 240–42, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *State* v. *Salmond*, supra, 179 Conn. App. 617; that would render subsequent in-court identifications admissible only under "rare circumstances." Under the defendant's proposed rule, such in-court identifications would be presumed inadmissible; the state would then bear the burden of proving by clear and convincing evidence that the in-court identification is nevertheless reliable. In assessing reliability, trial courts would first evaluate the system and estimator variables set forth in *State* v. *Harris*, supra, 330 Conn. 131–35, and then consider the "mugshot commitment effect," "the inherently suggestive nature of an in-court identification procedure," and the eyewitness' personal familiarity with the suspect. With respect to familiarity, the defendant claims that "the court should consider whether the in-court identification would be, not a test of the witness' memory, but a confirmatory identification in which there is virtually no possibility that the witness could misidentify the defendant . . . ." (Internal quotation marks omitted.) We decline the defendant's invitation to adopt this proposed rule.

For purposes of construing the contours of our state constitution to determine whether it provides greater protection than the federal constitution, we employ the multifactor approach adopted in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). "The factors that we consider are **(1)** the text of the relevant constitutional provisions; **(2)** related Connecticut precedents; **(3)** persuasive federal precedents; **(4)** persuasive precedents of other state courts; **(5)** historical insights into the intent of [the] constitutional [framers]; and **(6)** contemporary understandings of applicable economic and sociological norms [otherwise described as public

policies].” (Internal quotation marks omitted.) *State* v. *Cooper*, 353 Conn. 510, 534, 343 A.3d 465 (2025).

We begin our analysis with the observation that this case arises from circumstances that are distinct from most of our eyewitness identification cases. That is, the defendant and Coachman-Brown were not strangers at the time of the victim’s murder, and Coachman-Brown did not identify the defendant at trial on the basis of observations made during only a short encounter. Instead, Coachman-Brown spent more than a brief period of time with the defendant, whom he had known of for years, immediately prior to the murder and had a “front row seat” to that crime. See, e.*g.*, *Manson* v. *Brathwaite*, supra, 432 U.S. 112 (“Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness’ recollection of the stranger can be distorted easily by the circumstances or by later actions of the police.”). These circumstances, as discussed in connection with the defendant’s federal claims, ensured the reliability of his identification and inform the analysis that follows.

Turning to the *Geisler* factors, the defendant concedes the fact that the language of our state constitution’s due process provision; see Conn. Const., art. I, §8; is virtually identical to the language of the fourteenth amendment’s due process provision; see *State* v. *Harris*, supra, 330 Conn. 117; is a factor that favors the state. He also acknowledges that the current approach of federal courts, which remain bound to follow the independent source doctrine; see, e.*g.*, *United States* v. *Al-Farekh*, 956 F.3d 99, 110–11 (2d Cir. 2020), cert. denied,      U.S.    , 141 S. Ct. 1108, 208 L. Ed. 2d 552 (2021); and the historical insights into the intent of the constitutional framers are neutral factors.

We therefore turn to relevant Connecticut precedent. In recent years, the growing body of scientific research exposing the fallibility of eyewitness identifications has persuaded this court to “ma[ke] substantial changes to our eyewitness identification jurisprudence . . . .”

(Footnote omitted.) *State* v. *Perez-Lopez*, 218 Conn. App. 555, 576–77 and n.26, 293 A.3d 1, cert. denied, 348 Conn. 902, 301 A.3d 529 (2023). Most recently, in *State* v. *Harris*, supra, 330 Conn. 91, we held that the federal constitutional approach with respect to the admissibility of eyewitness identifications that result from unnecessarily suggestive procedures was "inadequate to prevent the admission of unreliable identifications . . . ." Id., 121. As a result, we adopted a new framework[6] that affords trial courts flexibility in considering various system and estimator variables when assessing the reliability of an identification; see id., 131–35; and "allows the . . . analysis to evolve as the relevant science evolves." Id., 121.

Other changes we have made in this area of the law include requiring first-time, in-court identifications to be prescreened by the trial court; see *State* v. *Dickson*, supra, 322 Conn. 426; permitting expert testimony on the reliability of eyewitness identifications under certain circumstances; see *State* v. *Guilbert*, supra, 306 Conn. 251–53; and increasing the level of familiarity required to favor the admission of lay witness identifications of a defendant in a surveillance video or photograph. See *State* v. *Gore*, 342 Conn. 129, 158–59, 269 A.3d 1 (2022).

Each of these decisions has considered scientific developments on eyewitness identifications in order to avoid "the primary evil . . . [of] a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 142; see *Neil* v. *Biggers*, supra, 409 U.S. 198. Indeed, "mistaken eyewitness identification[s] . . . [are] by far the leading cause of wrongful convictions." *State* v. *Guilbert*, supra,

[6]The framework adopted in *Harris* is as follows: "[T]o obtain a pretrial hearing, the defendant has the initial burden of offering some evidence that a system variable undermined the reliability of the eyewitness identification. . . . If the defendant meets this burden, the state must then offer evidence demonstrating that the identification was reliable in light of all relevant system and estimator variables. . . . If the state adduces such evidence, the defendant must then prove a very substantial likelihood of misidentification. . . . If the defendant meets that burden of proof, the identification must be suppressed." (Citations omitted.) *State* v. *Harris*, supra, 330 Conn. 131.

306 Conn. 249–50. Consistent with this understanding, we continue to be mindful of evolving research on this subject and "[establish] new rules aimed at . . . ensur[ing] that there is an accurate determination as to innocence or guilt." *Tatum* v. *Commissioner of Correction*, 349 Conn. 733, 758, 322 A.3d 299 (2024).

Nevertheless, we are unconvinced that, under the facts of the present case, abandoning the independent source doctrine would accord with our state precedent. We have observed on several occasions that the risk of misidentification is diminished in cases involving familiar identifications. See, e.g., *State* v. *Franqui*, supra, 354 Conn. 432–33; *State* v. *Gore*, supra, 342 Conn. 161–62; *State* v. *Williams*, supra, 317 Conn. 704–705. Thus, courts will often consider an eyewitness' personal familiarity with a suspect as a safeguard against misidentification. In the present case, the independent source doctrine allowed the trial court to do just that.

We turn next to the persuasive decisions of other state courts. Our research reveals that most jurisdictions still apply the independent source doctrine. See, e.g., *People* v. *Wall*, Docket No. 21CA0796, 2023 WL 12052104, *5 (Colo. App. 2023), cert. denied, Docket No. 24SC77, 2024 WL 3052328 (Colo. June 17, 2024); *Patrick* v. *United States*, supra, 343 A.3d 583–84; *State* v. *Shelvin*, 424 So. 3d 616, 616 (La. 2025); *People* v. *Williams*, supra, 41 N.Y.3d 556–57; *Wright* v. *State*, Docket No. 14-23-00744-CR, 2025 WL 970432, *2 (Tex. App. 2025); *State* v. *Nawrocki*, 308 Wis. 2d 227, 247, 746 N.W.2d 509 (App.), review denied, 310 Wis. 2d 706, 754 N.W.2d 850 (2008).

The defendant cites decisions from only two states, New Mexico and Massachusetts, that take a different approach with respect to the independent source doctrine. Those decisions do not support his claims in the present case. First, the New Mexico Supreme Court has abandoned the independent source doctrine in cases involving "disputed eyewitness identifications," *except* "[when] the eyewitness . . . is personally familiar with

the perpetrator of the crime." *State* v. *Martinez*, 478 P.3d 880, 905 (N.M. 2020). The New Mexico approach expressly permits courts to admit in-court identifications on the basis of an eyewitness' prior familiarity with the defendant; id.; which was done in the present case. Second, the Massachusetts Supreme Judicial Court has partially retained the independent source doctrine. Under the Massachusetts approach, if a court declares an out-of-court identification inadmissible on the ground that it was unreliable, the court cannot admit a subsequent in-court identification. See *Commonwealth* v. *Johnson*, supra, 473 Mass. 603. However, when an out-of-court identification has been suppressed on the ground that it was unnecessarily *suggestive*, rather than unreliable, a court may admit an in-court identification if the state proves by clear and convincing evidence that the subsequent identification rests on an independent source. Id., 602. The Massachusetts approach is based on that state's unique framework with respect to unnecessarily suggestive out-of-court identifications[7] and, thus, is inconsistent with our standard, as exemplified by *State* v. *Harris*, supra, 330 Conn. 116–31. This *Geisler* factor favors the state.

Finally, we turn to contemporary sociological and scientific understandings of eyewitness identifications. On many occasions, "[w]e have recognized that recent scientific developments abundantly [demonstrate] the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications." (Internal quotation marks omitted.)

---

[7]Massachusetts applies a "per se exclusion standard" with respect to the admissibility of out-of-court identifications. *Commonwealth* v. *Johnson*, supra, 473 Mass. 597. This approach, however, "does not keep relevant and reliable identification evidence from the jury because the [c]ommonwealth may admit a subsequent identification if it proves by clear and convincing evidence that the identification came from a source independent of the suggestive procedure." (Internal quotation marks omitted.) Id., 598.

*State* v. *Gore*, supra, 342 Conn. 160. The research cited by the defendant is consistent with these observations[8] but does not contradict existing scientific evidence that "prior familiarity with the [accused] . . . generally increases the accuracy of a [witness'] description and identification . . . ." (Citation omitted.) G. Wells et al., "Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence," 44 Law & Hum. Behav. 3, 10 (2020).

For these reasons, we decline the defendant's invitation to adopt a new rule under our state constitution with respect to the admissibility of in-court identifications that follow unnecessarily suggestive out-of-court identifications. We leave for another day whether circumstances involving in-court identifications made by *strangers* to the perpetrator after an unnecessarily suggestive out-of-court identification may compel a different conclusion. Because the present case involves an eyewitness who knew of the defendant for about six years prior to the murder, and "[t]he primary concern expressed in cases discussing the problems with eyewitness identification relates to a [witness'] observing and subsequently identifying a stranger"; (internal quotation marks omitted) *Haliym* v. *Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007); this case does not warrant the reconsideration of our standard for admitting in-court identifications. Accordingly, we conclude that the defendant has failed to demonstrate that the trial court's admission

---

[8]See H. Fradella, "A Synthesis of the Science and Law Relating to Eyewitness Misidentifications and Recommendations for How Police and Courts Can Reduce Wrongful Convictions Based on Them," 47 Seattle U. L. Rev. 1, 22 (2023) ("[a]mong the most important lessons learned from scientific studies of face perception and eyewitness performance is the fact that facial recognition, *particularly of strangers*, is a more difficult task than is commonly recognized" (emphasis added; internal quotation marks omitted)); National Research Council, "Identifying the Culprit: Assessing Eyewitness Identification" (2014) p. 39, available at https://www.nationalacademies.org/read/18891 (last visited May 21, 2026); see also B. Garrett, "Eyewitnesses and Exclusion," 65 Vand. L. Rev. 451, 481 n.138 (2012).

of Coachman-Brown's in-court identification of him violated his state due process rights.

The judgment is affirmed.

In this opinion the other justices concurred.